**Benito TALAMANTEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 171–91.

Court of Criminal Appeals of Texas, En Banc.

March 25, 1992.

---

Larry Vick, Houston, Roy E. Greenwood, Austin, on appeal only, for appellant.

Alger H. Kendall, Jr., Dist. Atty., Karnes City, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant, a County Commissioner from Wilson County, was convicted of the offense of official misconduct of the grade of third degree felony under V.T.C.A. Penal Code, § 39.01(a)(2), (c)(4). His punishment was assessed at four years confinement, probated for six years, and a fine of $5,000.00. In an unpublished opinion, the San Antonio Court of Appeals reversed, holding that the trial court erred in failing to grant appellant's motion to quash the indictment on the grounds of duplicity in each of two paragraphs of the first count. We granted the State's petition for discretionary review in order to examine this issue.

### I.

#### A.

Each paragraph of the first count of the indictment alleges appellant misapplied a thing of value belonging to Wilson County, "to wit: use of county equipment, bull-

---

dozer and maintainer, of the value of $750.00 or more but less than $20,000.00 by using the equipment to clear brush, shape a creek, and tank dam, on property belonging to members of [appellant's] family[.]" Each paragraph alleges this misapplication occurred "on or about and between the dates of October 31, 1986 and January 31, 1988," a fifteen month stretch of time. The only difference between the two paragraphs is that the first alleges appellant acted "with intent to obtain a benefit for himself[,]" while the second alleges an "intent to harm another[.]" [1] Appellant argued to the court of appeals that this count is duplicitous in that it "alleged several transactions over the fifteenth month period, thereby joining a series of distinct offenses in each paragraph." Slip op. at 2. Although multiple instances of theft may be joined in a single offense, and value aggregated accordingly to reach a felony amount, under V.T.C.A. Penal Code, § 31.-09, no comparable provision appears in Chapter 39 of the Penal Code authorizing aggregation of repeated commission of official misconduct to obtain a felony conviction.

The court of appeals agreed. The court began its analysis by pointing out that former V.T.C.A. Penal Code § 3.01, prior to amendment in 1987, controls in this cause. Accordingly, only repeated commission of property offenses in Title 7 of the Penal

---

1. The first count of the indictment reads in its entirety:

"[O]n or about and between the dates of October 31, 1986 and January 31, 1988 and before the presentment of this indictment, in the County and State aforesaid, Benito Talamantez (hereinafter called Actor), did then and there as a public servant, to-wit: Commissioner, Precinct $ 1, Wilson County, Texas and with intent to obtain a benefit for himself did intentionally and knowingly misapply a thing of value, to-wit: use of county equipment, bulldozer and maintainer, of the value of $750.00 or more but less than $20,000.00 by using the equipment to clear brush, shape a creek, and tank dam, on property belonging to members of the Actor's family, the said equipment belonging to Wilson County, Texas, and said equipment had come into the Actor's possession and custody by virtue of his office and employment...."

"[O]n or about and between the dates of October 31, 1986 and January 31, 1988 and before the presentment of this indictment, in the County and State aforesaid, Benito Talamantez (hereinafter called Actor), did then and there as a public servant, to-wit: Commissioner, Precinct $ 1, Wilson County, Texas and with intent to harm another did intentionally and knowingly misapply a thing of value, to-wit: use of county equipment, bulldozer and maintainer, of the value of $750.00 or more but less than $20,000.00 by using the equipment to clear brush, shape a creek, and tank dam, on property belonging to members of the Actor's family, the said equipment belonging to Wilson County, Texas, and said equipment had come into the Actor's possession and custody by virtue of his office and equipment [sic]...."

Code could be joined in a single indictment. See *Drake v. State*, 686 S.W.2d 935 (Tex. Cr.App.1985); *Fortune v. State*, 745 S.W.2d 364 (Tex.Cr.App.1988). Because official misconduct does not appear in Title 7 of the Penal Code, repeated commission of that offense could not be alleged in a single indictment. Moreover, as appellant avers, to allow repeated commission of official misconduct to be alleged as one offense would in effect provide for the aggregation of offenses in Chapter 39 of the Penal Code where the Code itself only expressly provides for aggregation of Chapter 31 theft offenses. Thus, if each paragraph of the first count of the instant indictment does in fact allege more than one commission of the offense of official misconduct, then each paragraph does suffer the defect of duplicity, and the trial court erred in failing to grant the motion to quash.

The court of appeals then turned to the question whether each paragraph does in fact allege more than one commission of official misconduct. Concluding that they do, the court of appeals analogized to this Court's opinion in *Whitehead v. State*, 745 S.W.2d 374 (Tex.Cr.App.1988). There we implicitly held "that the timber at issue [of the value of more than $10,000.00] was not a unit of property but instead, several units of property" the theft of which must be pled under the aggregation provisions in § 31.09 to obtain a felony conviction. Slip op. at 5. Here the court of appeals drew "a similar conclusion[,]" *viz:* "The indictment, alleging misapplication of county equipment: bulldozer and maintainer, by using the equipment to clear brush, shape a creek and tank dam, alleges several misapplications rather than one." *Id.* However, because official misconduct cannot be aggregated as can theft, it was not permissible to allege multiple misapplications in the same way that it was held permissible to allege multiple thefts in *Whitehead.*

Having concluded it was error not to quash the first count of the indictment, the court of appeals held the error was harmful because, given the nature of the evidence at trial going to the value of the use of the equipment, the jury might have relied on more than one instance of official misconduct to arrive at a felony amount.[2] Our grant of discretionary review does not reach this question, and in any event our ultimate disposition today obviates a harm analysis.

Justice Biery filed a separate, concurring opinion. He agreed that both paragraphs in the first count of the indictment were duplicitous. He specified, however, that he did not believe the paragraphs were defective in alleging that more than one "task" was conducted (i.e., "clear brush, shape a creek, and tank dam"), or that the activity took place over more than one twenty-four hour period. Rather, he believed the duplicity occurred only inasmuch as the paragraphs allege that more than one piece of equipment, and thus more than one "thing of value," was allegedly misapplied.

**B.**

The State now cites a number of cases involving offenses ranging from bribery to castration for the proposition that because appellant was operating under a single and continuing impulse, *viz:* to improve realty belonging to his children at county expense, it was proper to allege multiple "things" put to multiple "tasks" over a number of months.[3] Each of these cases is analytically distinguishable. For instance,

---

**2.** Although the statute makes value of the use of the misapplied thing a punishment issue, see *Wilson v. State,* 772 S.W.2d 118 (Tex.Cr.App. 1989), the trial court nevertheless submitted the issue in the application paragraph of the charge on guilt/innocence, requiring the jury to acquit appellant altogether should it find less than a felony value, even though it may otherwise find every element necessary to establish an offense beyond a reasonable doubt! This is even more anomalous considering that the district court does not require the pleading of a felony amount to acquire jurisdiction over a prosecu-tion for official misconduct. See Article 4.05, V.A.C.C.P.

**3.** Proof at trial shows the bulldozer was used intermittently over a three month period, mostly on weekends, and when not in use during that period, apparently remained idle on appellant's children's property. The maintainer was used at least once to help pull the bulldozer out of a ditch, where it had gotten stuck. The county yard was adjacent to this property.

the State cites *Cody v. State*, 31 Tex.Cr.R. 183, 20 S.W. 398 (1892). This is the case that announced an exception to the general rule of the common law that "restricted the scope of theft to a single victim and a single time and place; if more than one victim or more than one time was involved, more than one theft was committed." S. Searcy & J. Patterson, Practice Commentary, 3 Vernon's Texas Codes Annotated— Penal Code 571 (1974). The announced exception was that "when several articles or things in bulk are taken by continuous acts, there being one purpose, one impulse, the act is one, without regard to time." 20 S.W. at 398. We think the examples the *Cody* court subsequently invokes to illustrate this exception, however, would fairly tend to make it inapplicable to the misappropriation at hand. The gist of these examples is that individual asportations of property, as in repeated trips to load a getaway wagon with stolen goods, constitute but a single act of larceny, not as many larcenies as it takes trips to fill the wagon. The *Cody* exception has been held not to apply where repeated fraudulent Medicaid claims filed over the course of a year added up to felony theft, although no particular claim exceeded the misdemeanor amount. *Turner v. State*, 636 S.W.2d 189 (Tex.Cr.App.1982) (Opinion on State's motion for rehearing).[4] While it might be said that a single "purpose" ran through all these transactions, *viz:* the intent to defraud the insurance company, the court nevertheless held the amounts could not be aggregated absent pleading and proof of a single "offense" under the specific theft-aggregation statute, § 31.09. *Id.*

In *Bates v. State*, 587 S.W.2d 121 (Tex. Cr.App.1979), cited by the State, the indictment does not allege multiple instances of bribery, but simply various manners and means by which a single instance of bribery may have been committed. *Mutscher v. State*, 514 S.W.2d 905 (Tex.Cr.App.1974), also cited by the State, stands for the proposition that where a number of persons jointly offer money or some other consideration to an individual in exchange for an act that benefits each offeror in some discrete way, and the combined offer is accepted, there is still only one offer and one acceptance, and hence only one instance of bribery. See also *Goldman v. State*, 130 Tex.Cr.R. 471, 95 S.W.2d 423 (1936) (Opinion on original submission). These cases do not involve extended conduct, as we have in this cause.

Two cases cited by the State do involve extended conduct. One is also a bribery case, *McClelland v. State*, 390 S.W.2d 777 (Tex.Cr.App.1965). McClelland was a probate judge in Houston. An elaborate scheme was set up whereby McClelland appointed one of five particular persons to be the estate appraiser in a majority of cases that came before him. In exchange for this preferential treatment, these five individuals set up a dummy corporation, opened a bank account in the name of the corporation, and authorized McClelland's secretary to sign checks on the account. Each of the five appraisers then deposited various sums of money over time into the account, and McClelland would draw against the account from time to time for various personal expenses. Because the monies were mingled, and withdrawn in increments from the account, it was difficult to identify a particular moment in time when it could be said that an offense occurred. "The money, of course, lost its identity or common source when it was deposited so that it would have been impossible to determine how much of each of the five men's deposits went to appellant at a given time." *Id.*, at 780. Perhaps because the offense would otherwise have been impossible to pinpoint, the Court concluded that "we are dealing with one offense involving many transactions." On this basis the Court held that the State need not elect which transaction it would rely on to convict.

The other extended-offense case the State relies on is *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978). In *Crocker*

---

**4.** Interestingly, *Turner* was this Court's primary authority for its holding in *Whitehead,* supra, the case the court of appeals relied on in the present case to hold the indictment in this cause alleges more than one instance of official misconduct.

the defendant systematically exposed his son to radioactive material that eventually destroyed the child's testicles. Crocker was convicted of the offense of castration. He argued on appeal that the State should have been required to elect among the various incidents of radiation exposure the one incident it relied on for conviction. Because no single exposure was alone sufficient to destroy the testicles, however, the Court held, on authority of *McClelland,* supra, that the offense was comprised of numerous "transactions," and election was not required.

In both *McClelland* and *Crocker* the State apparently could not have proven its case at all without alleging and proving an extended course of conduct. The same cannot be said of the instant case. The first day appellant took either the bulldozer or the maintainer onto his children's properties and began to use them to make improvements thereon, it could be said he had committed an actionable instance of official misconduct. It is true that if the value of the use of the equipment does not amount to $750.00 or more by the end of the first day he has not committed a felony offense. He has, however, committed an offense. It was not necessary to plead and prove conduct extending over the course of fifteen months to prosecute appellant in this cause. Therefore, in our view, *McClelland* and *Crocker* are not compelling authority.

## II.

In concluding that the indictment alleges multiple instances of official misconduct the court of appeals seems to have been largely intuitive. The authority it relied on, *Whitehead v. State,* supra, is at best tenuous. The State counters with what amounts to no more than a competing intuition—that because appellant's evident purpose was the same, his whole course of conduct should be prosecuted singularly. But, as indicated *ante,* its problem is that the authorities on which it relies deal with a variety of offenses statutorily defined and implemented in manners other than "official misconduct." Compare cases cited and discussed in Part I B, at 4–7.

■ Based on their history, character and nature, we regard proceedings involving "official misconduct" as *sui generis.* See generally, e.g., *Emerson v. State,* 727 S.W.2d 267 (Tex.Cr.App.1987) (dissenting opinion, at 269 ff); *Gallagher v. State,* 690 S.W.2d 587, 591–593 (Tex.Cr.App.1985) (dissenting opinion, at 594ff); *Bolton v. State,* 69 Tex.Cr.R. 582, 154 S.W. 1197 (1913); *Craig v. State,* 31 Tex.Cr.R. 29, 19 S.W. 504 (1892); *Brackenridge v. State,* 27 Tex. App. 513, 11 S.W. 630, at 633 (1880).

At common law "misfeasance" and "malfeasance" in public office were criminal offenses. Interpretive Commentary following Article V, § 24, Constitution of the State of Texas.[5] In Article V, § 8, the district court was granted jurisdiction over "all misdemeanors involving *official misconduct,*" and in § 24 one cause for removal from public office the term is "official misconduct," *viz:*

" [Designated county officers] may be removed ..... for incompetency, *official misconduct,* habitual drunkenness, or other causes defined by law[.] "

Apparently the Framers deemed the meaning of the term so commonly understood that they felt no need to define it in §§ 4 or 24, or elsewhere in the Constitution. See *Gallagher v. State,* supra, at 592.

Nonetheless from *Trigg v. State,* 49 Tex. 645 (1878), and learned works, revisers fashioned a definition and included it as article 3393, R.C.S. 1879;[6] the definition continued as article 3534, R.C.S. 1895, arti-

---

**5.** In the Reconstruction Constitution of 1869, Article V, § 24, provided:

"All county and district officers, whose removals are not otherwise provided by law, may be removed, on conviction by a jury, after indictment, for malfeasance, nonfeasance, or misfeasance in office."

**6.** Former article 3393 provided:

"By 'official misconduct,' as used herein with reference to county officers, is meant any unlawful behavior in relation to the duties of his office, willful in its character, of any officer intrusted in any manner with the administration of justice, or the execution of the law; and includes any willful or corrupt failure, refusal or neglect of an officer to perform any duty enjoined on him by law."

cle 6033, R.C.S. 1911, 5973, R.C.S. 1925, and is now V.T.C.A. Local Government Code, § 87.011(3), *viz:*

" 'Official misconduct' means intentional, unlawful behavior relating to official duties by an officer entrusted with the administration of justice or the execution of the law. The term includes an intentional or corrupt failure, refusal, or neglect of an officer to perform a duty imposed on the officer by law."

Officers subject to removal include a county commissioner. *Id.,* § 87.012(4). A general ground for removal is "official misconduct." *Id.,* § 87.013(2). Furthermore, as did former statutes, the code provides a separate proceeding for removal by petition, *id.,* § 87.015, as well as that conviction by a jury for any felony or misdemeanor "involving official misconduct" operates as an immediate removal from office, and the judgment of the court shall order the officer removed. *Id.,* 87.031(a) and (b). Acts 1987, 70th Leg., ch. 149, p. 805–806, 808, eff. Sept. 1, 1987. See, e.g., *State ex rel. Hightower v. Smith,* 671 S.W.2d 32, at 34–35 (Tex.1984); *Sullivan v. State,* 572 S.W.2d 778 (Tex.Civ.App.—El Paso 1978) writ refused n.r.e.; *Trevino v. Barrera,* 536 S.W.2d 75 (Tex.Civ.App.—San Antonio 1976); cf. *Eckels v. Gist,* 743 S.W.2d 330

(Tex.App.—Houston [1st] 1987). The authorities just cited serve to demonstrate that in a given situation there may be a close relationship between "removal official misconduct" and "criminal official misconduct."

Contemporaneous with the former civil statutes authorizing removal of county officers, there were a host of penal statutes which applied to violations of specifically prescribed duties of particular public officers; in 1974, V.T.C.A. Penal Code, § 39.01 replaced them, requiring culpable mental states and broadening coverage to embrace a more comprehensive category of "public servant." See Practice Commentary.[7] As revised in 1983, § 39.01 now states the penal offense of "official misconduct" in simpler terms, *viz:*

"(a) A public servant commits an offense if, with intent to obtain a benefit or with intent to harm another, he intentionally or knowingly:

(1) violates a law relating to his office or employment; or

(2) misapplies any thing of value belonging to the government that has come into his custody or possession by virtue of his office of employment."

Ten years later, the Legislature revised this statute along with amending several others in an Act "relating to offenses against public administration [Chapter 36. Bribery and Corrupt Influence] and offenses involving the abuse of office or employment [e.g., § 39.01], including theft, by public servant, [et cetera]." Acts 1983, 68th Leg., Ch. 558, p. 3237, eff. Sept. 1, 1983 (Act).

Presumably legislators found the first three ways to commit "official conduct" superfluous in light of the fourth, so the former were deleted. Also, in light of the commentators' criticism of the fifth, and perhaps aware of problems raised in the litigation reflected by *Garza v. State,* (Tex.App.—San Antonio, No. 04–82–00256–CR), and illuminated in *id.,* 687 S.W.2d 325 (Tex.Cr.App.1985), the Legislature removed "taking" from the fifth way, transfered to and incorporated it in an increased range of punishment for theft in § 31.03, and then rewrote the range of punishment for "official misconduct" to conform to related provisions for simple theft according to value (cf. § 7 of the Act, at 3242, with § 11, at 3244–3245).

In the text above we deal with the latter version formed by the 1983 Act.

---

7. Moreover, as originally enacted § 39.01 described five different ways in which a public servant may commit the offense of "official misconduct," *viz:* unauthorized exercise of official power, acts exceeding power, failure to perform a mandatory duty, violating law relating to the office, and *taking* or misapplying any thing of value under control of the officer. *Ibid.* The first four ways were Class A Misdemeanor; the fifth was a third degree felony.

With reference to the fifth offense, the language in original § 39.01(a)(5) seems to have been drawn from former article 95, "Misapplication of county or city funds," reading in pertinent part:

If any officer of any county ... shall fraudulently take, *misapply,* or convert to his own use *any* ... property or other *thing of value* belonging to such county ... that may have come into his custody or possession by virtue of his office or employment, or shall secrete the same with intent to take, *misapply* or convert it to his own use, or shall pay or deliver the same to any person knowing that he is not entitled to receive it, he shall be confined in the penitentiary not less than two nor more than ten years."

Under subsections (b) and (c), respectively, an offense prescribed by subsection (a)(1) (violation of law relating to public position) is a Class A misdemeanor; an offense prescribed by subsection (a)(2) (misapplication of governmental thing of value) is a class of misdemeanor or degree of felony according to "the value of the use of the thing misapplied." Without any doubt here appellant, as alleged, "did misapply a thing of value, to-wit: use of county equipment," contrary to subsection (a)(2). The remaining questions are whether the indictment permissibly asserts one or more offense and then, in terms of punishment, what classification of offense attaches to his "official misconduct."

■ The indictment paragraphs allege misapplication "on or about and between the dates of October 31, 1986 and January 31, 1988," thus plainly appearing to cover conduct on no particular day, but rather extending over the fifteen month period. The evidence shows, of course, that use of the county equipment was not continuous, but intermittent. When tested by germane provisions of the penal code, arguably because appellant engaged in "official conduct" intermittently he committed a series of misapplications, each constituting a single separate offense.[8] Given the character and nature of "official misconduct," see

*ante*, at 179–81, however, our judgment is that the theory of this prosecution comports with a reasonable construction of the underlying statute, construed in light of prior decisions under similar statutory proscriptions then extant.

■ In common usage "to apply" in the sense germane to the statute means "to put to use," and "to use" means "2. to put into action or service 3. to carry out a purpose by means of; ... to apply to advantage." In the same sense "to misapply" means "1. to apply wrongly ... 2. to misuse or spend (as public money without proper authority ...)." Webster's Third New International Dictionary (1969); Webster's New International Dictionary (Second Ed.1944); see also Black's Law Dictionary (Rev. Fourth Ed.) (1968). Because in this type of "official misconduct" any thing of value must first be in the custody or possession of a public servant, and an essential element is a specific intent to obtain a benefit or to harm another, we deduce from authoritative decisions under former statutes that one engages in "official misconduct" whenever one forms the requisite specific intent at the outset or in the course of or after misusing any thing of value belonging to the government. See cases cited in the margin.[9] Accord: *Barnes v.*

8. The penal code defines "conduct" as "an act or omission and its accompanying mental state." V.T.C.A. Penal Code, § 1.07(8). "'Act' means a bodily movement, whether voluntary or involuntary..." *Id.*, § 1.07(1). "'Elements of offense' means[,]" *inter alia*, "the forbidden conduct" and "the required culpability[.]" *Id.*, § 1.07(13).

That appellant's "mental state," or his "required culpability"—his impulse or purpose, as the State would have it—may have endured over period of several months does not mean his "conduct" was singular. The "bodily movement" necessary to constitute "conduct," and hence, an "offense," occurred on the first occasion the evidence shows the equipment was used. Thereafter there were extended periods of times during which the equipment stood idle, and was not subjected to any "bodily movement" at all. Regardless of his continuing purpose, during those periods appellant was not engaged in "conduct" constituting an offense. When the "bodily movement" resumed on subsequent occasions, new and discrete misapplication offenses were committed.

While appellee does not make the forgoing analysis, the thrust of his contentions is that the

indictment alleges a series of distinct offenses in each paragraph; the court of appeals agreed. See *ante,* at 176–77.

9. Prior to 1974 the Court deemed former statutes proscribing misapplication of public funds to be sufficiently similar to the general statute on embezzlement that decisions under one were persuasive in considering issues under the other. *Burgess v. State,* 108 Tex.Cr.R. 48, 299 S.W. 254, 256 (1877). Likewise the Court looked to the indictment and facts of the offense to determine when a misapplication or embezzlement first occurred and whether there were one or more offenses involved.

When the indictment alleged a taking, misapplication or conversion of money, property or other thing of value in such a way as to contemplate proof showing such misconduct on more than one occasion over a period of time, and the evidence supported that theory, the Court upheld the prosecution and conviction. See, e.g., *Hamer v. State,* 60 Tex.Cr.R. 341, 131 S.W. 813, at 814, 815–816 (1910); *Ferrell v. State,* 68 Tex. Cr.R. 487, 152 S.W. 901, at 903, 905 (1912); *McKinney v. State,* 104 Tex.Cr.R. 315, 283 S.W.

*State,* 824 S.W.2d 560, 562–563 (Tex.Cr. App., delivered December 11, 1991), (motion for rehearing denied February 12, 1992). Subsequent decisions of the Court as well are to the same effect.

In *Powell v. State,* 549 S.W.2d 398 (Tex. Cr.App.1977), the Court dealt with a conviction for "official misconduct" under the 1974 rendition of § 39.01(a)(5). Powell, a public servant responsible for supervising a division of an independent school district, was alleged with requisite intent to have used money coming into his possession by virtue of his employment as payment for building materials and labor supplied by a lumber company for his personal uses. The evidence showed that during one year Powell caused four separate checks totaling some twelve thousand dollars payable to the lumber company to be withdrawn from a school district fund in its bank depository; to cover the amounts drawn, the payee lumber company prepared fictitious invoices, while actually crediting the proceeds to its costs for materials and labor in repairing or remodeling a ranch-house belonging to Powell, who spent none of his own funds for the work done. The Court upheld the indictment and sufficiency of the evidence to support a conviction for a single "official misconduct" offense and concomitant punishment for a third degree felony.

Similarly, in a civil removal suit against a sheriff for misappropriating county vehicles and fuel to patrol an apartment complex in exchange for a rent-free apartment, the Supreme Court determined that the sheriff performed an "unlawful act," in that he "was charged with official misconduct under former § 39.01(a)(5) of the Penal Code, which prohibited taking or misapplying any thing of value belong to the government." *State ex rel. Hightower v. Smith,* 671 S.W.2d 32, at 35 (Tex.1984).[10] The Supreme Court held: "Wilfully using county vehicles and fuel for private benefit constitutes misapplication or misappropriation, even though the same activity accomplishes a legitimate public function." *Ibid.*[11]

798, at 799–800 (1925); *Burgess v. State,* supra, 299 S.W. at 255, 257 (1927); *Mayse v. State,* 156 Tex.Cr.R. 360, 242 S.W.2d 371, 372 (1951); *Floyd v. State,* 164 Tex.Cr.R. 50, 296 S.W.2d. 523, at 525–526, 529 (1956); *Kirkpatrick v. State,* 515 S.W.2d 289, 291–292 (1974).

On the other hand, when the indictment identified instances of such misconduct in separate counts, the Court usually confronted problems of jeopardy, misjoinder, election, extraneous offenses and the like, and more often than not treated each count as constituting a separate offense, but allowed evidence of other acts of misconduct to show intent, motive, plan *et cetera.* See, e.g., *Miller v. State,* 92 Tex.Cr.R. 259, 242 S.W. 1040 (1922) (compare original opinion, 242 S.W. at 1041–1043, with opinion on rehearing, at 1044 ff); *Campbell v. State,* 163 Tex.Cr.R. 545, 294 S.W.2d 125, 126, 128–129 (1956); see also *Nees v. State,* 402 S.W.2d 186 (Tex.Cr.App. 1966), *Nees v. Culbertson,* 406 F.2d 621 (C.A. 5 1969), cert. denied 395 U.S. 959, 89 S.Ct. 2098, 23 L.Ed.2d 745 (1969).

**10.** As excerpted in *Smith v. State ex rel. Hightower,* 671 S.W.2d 48 (Tex.App.—Tyler 1983), an essential paragraph of the removal petition alleged:

"Defendant has appropriated for his own benefit various Smith County Sheriff's patrol cars, and the gasoline necessary to operate such cars, on many dates including the following: May 1, 1981; June 1, 1981; and July 1, 1981. These automobiles and the gasoline necessary to operate them were used to patrol the Casa De Oro Apartments in the City of Tyler, Texas, for the purpose of obtaining a rent-free apartment for the Defendant and his agents."

*Id.,* at 49. The jury answered "yes" to a special question framed in almost identical terms, and further found that defendant "is by such conduct guilty of official misconduct by unlawful behavior in relation to the duties of his office...." *Id.,* at 49–50.

**11.** The Supreme Court explained factually, *viz:*

"The evidence was uncontroverted that Smith received a rent-free apartment in the complex where at least thirty-seven CIPs [checks-in-passing] were performed at his order over a five-month period. There was testimony that Smith's arrangement was unusual because he did not actually live on the premises like other officers who provide off-duty security[.] * * * * There was testimony that in other circumstances requests for CIP patrols were usually carried out for three days, not five months. This was some evidence from which the jury could reasonably find the CIPs were not routine but were Smith's means of fulfilling his private agreement for his own gain.1" *Id.,* at 35. In note 1, it distinguished other arrangements to iterate: "But when, as here, the evidence supports the conclusion that private gain is earned through the use of official property and labor, a charge of official misconduct is sustainable." *Ibid.*

■ Although the Legislature amended former § 39.01(a) to eliminate certain particulars not relevant here, *inter alia:* the requirement that intended benefit be "for himself," certain acts of misconduct formerly enumerated, and "the confusing statement of elements of the offense in former subdivision (5)," decisions cited above and in note 9, *ante,* at 181, construing and applying prior statutes proscribing substantially the same "official misconduct" denounced in § 39.01(a)(2) are persuasive enough to lead us to conclude that an indictment may properly allege "official misconduct," *in gross,* as it were, consisting of misapplication of any thing of value over a period of time with intent to benefit others for as long as the "thing" is being thus used.

■ Having come to that tentative conclusion, we must now determine the impact of provisions for a broad range of punishment § 39.01(c), which as noted *ante,* at 180–81, classify offenses according to "the value of the use of the thing misapplied." In this connection, worth noticing is that originally what is now § 39.01(c) formerly classified all lesser offenses as Class A misdemeanors, whereas the offense of "taking" or "misapplying" any thing of

value was punishable as a felony of the third degree, regardless of its value.[12] Presumably cognizant of certain stated objectives of the penal code in § 1.02, the Legislature deemed it advisable to change the method of allocating punishments from considerations of relative seriousness of "species" of "official misconduct," i.e., the manner or way the actor engaged in "official misconduct," in favor of two classifications: one, making a "species" of violating the law relating to official position a Class A misdemeanor; the other, making "misapplication" a class of misdemeanor and degree of felony offenses, depending on the "value of the *use* of the thing misapplied." Our concern here, of course, is solely with the latter.

■ Just as we determined the proper meaning of "misapplies" in subsection (a)(2) from related germane terms, *ante,* at 181, now we must find what the Legislature intended "the use" to mean in the phrase "value of the *use* of the thing" in subsection (c). Consonant with the proposition that a public servant may misapply any thing of value *in gross* is the notion that "the use" of any such thing also contemplates the "duration" of misuse.[13]

12. Obviously disappointed with the Legislature for "an unfortunate departure from the consolidation of theft offenses [in Chapter 31]," so that, "for example, *theft* of less than $5 in value—normally a Class A misdemeanor—is a felony," the commentators suggested a preferable alternative, *viz:*

   "That result could have been attained without the confusing statement of the elements of the offense in Subdivision (5) by adding a phrase to the punishment provision of the *theft* offense stating that *theft* is a felony of the third degree, regardless of the value of the property stolen, if the actor is a public servant and if he *steals* the public property under his control. Such a drafting technique would also have allowed the harsher, second degree felony treatment, which is available for other *thefts,* when a public servant *steals* more than $10,000."

   Practice Commentary to § 39.01. As pointed out, *ante,* n. 7, at 180, in 1983, the Legislature really achieved more than suggested by amending § 31.03(e) to raise respective monetary values related to each class of unadulterated theft to a cap of $20,000, then adding subsection (f) to provide an increase to the next higher catego-

ry of offense if committed by public servant under prescribed circumstances similar those previously stated in former § 39.01(a)(5).

   In short, the Legislature stripped from § 39.01 "official misconduct" all provisions insofar as they related to *"taking"* (theft), leaving only "misapplying" in revised subsection (a)(2) and a revamped range of punishment based on "the value of the use of the thing misapplied" in subsection (c).

13. "To use" is a verb, commonly meaning "to put into action or service," et cetera, *ante* at 181. As a noun, however, "the use" has various connotations, generally "the act or practice of employing something," more discretely others, *viz:*

   "1 a: The act or practice of using something: EMPLOYMENT <a [use] of *his public post to* secure a favor for a friend> <become familiar with algebra through the [use] of a good text> <an increase in the [use] of intoxicating liquors> <the [use] of subsidies to hold food prices down ...>
   \*    \*    \*    \*    \*    \*
   3 a: the privilege or benefit of using something <offered him the [use] of his pen for signing> <had the [use] of the usual class

Finally, as to what constitutes "any thing of value," our constitutions and laws always sought to protect "any money, property or other thing of value" belonging to the government. See, e.g., generally a collection of statutory prohibitions enumerated in former chapter 2, title 4, P.C. 1925, and more especially former articles 95 and 97 therein. Moreover, from 1945 to 1974 it was a specific penal offense for a county commissioner knowingly to "use or permit to be used for private profit to himself ... *any property, supplies, equipment, or other thing of value* belonging to the county," or "the labor or service of any person whose labor or service is paid for by such county[.]" See former article 978o (Penal Code 1925), as amended, the "service" part of which was incorporated in § 31.04(a)(2). The courts construed those statutes and others to authorize prosecution as a single offense the entirety of "any thing of value" misapplied even though it was actually "used" intermittently thereafter. See, e.g., *Hamer v. State*, 60 Tex.Cr.R. 341, 131 S.W. 813, at 814, 815–816 (1910); *Ferrell v. Sate*, 68 Tex.Cr.R. 487, 152 S.W. 901, at 902, 903, 905 (1912); *McKinney v. State*, 104 Tex. Cr.R. 315, 283 S.W. 798, at 799–800 (1925); *Burgess v. State*, 108 Tex.Cr.R. 48, 299 S.W. 254, at 255, 256 (1927); *Mayse v. State*, 156 Tex.Cr.R. 360, 242 S.W.2d. 371, at 872 (1951). That money was the "thing of value" in those cases does not require a different analysis or result where corporeal personal property is the "thing." Now that the Legislature has included everything under the umbrella of "any thing of value" the controlling principles in those cases are equally apt here. See, e.g., *Powell v. State*, 549 S.W.2d 398, at 399, 400 (Tex.Cr.App.1977) (money withdrawn in four checks over extended period); *State ex rel. Hightower v. Smith*, 671 S.W.2d 32, at 33, 35 (Tex.1984), on remand 673 S.W.2d 704 (Tex.App.—Tyler 1984) (value of rent-free apartment over six months obtained through official misconduct).

time for study> <nor shall private property be taken for public [use] without just compensation ...>"
Webster's Third New International Dictionary (1969) 2523; see also Webster's New International Dictionary (Second Ed.1944); Webster's

It follows that "the value of the use of the thing misapplied" is the sum of fair value in use of such thing, accruing with "the use" of the thing, here alleged to be $750 or more but less than $20,000. See *Littlefield v. State*, 586 S.W.2d 534, at 535 (Tex.Cr.App.1979); *Prowell v. State*, 541 S.W.2d 432, at 433–434 (Tex.Cr.App.1976).

Accordingly, we hold that the indictment in this cause permissibly alleges misapplication of county equipment over a period of time with intent to obtain a benefit for as long as the county equipment is being used to complete the described undertaking. Therefore, it is not duplicitous.

For these reasons we reverse the judgment of the court of appeals, and remand the cause for disposition of appellant's remaining points of error.

New Collegiate Dictionary (1979); Black's Law Dictionary (Rev. Fourth Ed.1968) (in non-technical sense, "The 'use' of a thing means that one is to enjoy, hold, occupy, or have some manner of benefit thereof.")