Marylene MEGASON, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–99–00047–CR.

Court of Appeals of Texas,
Texarkana.

Submitted May 16, 2000.

Decided June 6, 2000.

ings. *See Pine v. Salzer,* 824 S.W.2d 779, 780 (Tex.App.-Houston [1st Dist.] 1992, no writ).

James E. Davis, Texarkana, for appellant.

Luke Madole, Dallas, Tim Cone, Upshur County Dist. Atty., Gilmer, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## O P I N I O N

Opinion by Justice GRANT.

Marylene Megason, the former County Clerk of Bowie County, appeals from her conviction of two counts for the offense of abuse of official capacity. On a change of venue motion, the case was transferred to Camp County for trial and was tried by a visiting judge with an attorney pro tem representing the State. A jury convicted Megason, and the court assessed her punishment on each count at one year in a state jail facility, probated for two years.[1]

---

1. The statute under which she was convicted reads in relevant part as follows:

 § 39.02. Abuse of Official Capacity
 (a) A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly:
 . . . .
 (2) **misuses government** property, **services**, personnel, or any other thing of value belonging to the government that has come

This case involves the alleged misuse of county funds and personnel in connection with the microfilming of old record books (in what is labeled as a part of a "re-creation project"), and the transfer of the old books to storage. The State presented evidence that Megason's two children, as M & M Moving, were paid $4,300 by Government Records Services for moving the oversized record books and their antique roller shelving from the county clerk's office to the basement of the courthouse after they were microfilmed and reprinted in new, smaller books. There was evidence that (1) the move was a county job and not part of the county's contract with Government Records Services, and (2) that Megason's children actually performed no work.

Undisputed evidence shows that Megason faxed two invoices under M & M Moving's name to Government Records Services, which paid a total of $4,300, and that Megason deposited the majority of the proceeds in her personal account.

Megason contends that there was no evidence or insufficient evidence to support the verdict because the evidence does not show the value of the services allegedly misused. She also contends that the court erred by refusing to read a particular portion of a witness's testimony to the jury at its request.

## SUFFICIENCY OF THE EVIDENCE

A legal sufficiency review calls on the reviewing court to view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Mason v. State*, 905 S.W.2d 570, 574 (Tex.Crim.App.1995).

In contrast, a factual sufficiency review dictates that the evidence be viewed in a neutral light, favoring neither party. *Johnson v. State*, —— S.W.3d ——, ——, No.1915–98, 2000 WL 140257, at *5 (Tex.Crim.App. Feb.9, 2000); *see Clewis v. State*, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). In determining the factual sufficiency of the elements of the offense, we view all the evidence without the prism of in the light most favorable to the prosecution (i.e., we view the evidence in a neutral light), and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 129. We review the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compare it with the evidence that tends to disprove that fact. *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996). In conducting a factual sufficiency review, we review the fact finder's weighing of the evidence, and we are authorized to disagree with the fact finder's determination. *Johnson*, at ——, 2000 WL 140257, at *4; *Clewis*, 922 S.W.2d at 133.

Megason specifically contends that the State did not provide adequate evidence to show that the services allegedly misused had a value greater than $1,500. She also contends that the proof did not show that the amount was accrued on the specific dates alleged and that the proof is insufficient because the indictment did not allege a continuing offense.

The facts show that the county clerk's office was running out of space and that some of the older volumes were becoming fragile. A firm was retained to microfilm and reproduce the record volumes in a more manageable size. During this process, the large roller shelves in which

into the public servant's custody or possession by virtue of the public servant's office or employment.
....
(c) An offense under Subsection (a)(2) is:
....

(4) a state jail felony if the value of the use of the thing misused is $1,500 or more but less than $20,000....

TEX. PEN.CODE ANN. § 39.02 (Vernon 1994) (Emphasis added.).

those volumes were stored were disassembled, moved to the courthouse basement, reassembled, and reloaded with the record volumes. This prosecution stems from the transfer of county records, in the form of approximately 1,000 record books, from the county clerk's office to the basement of the courthouse, and the payment of $4,300 for that move to M & M Moving, an entity consisting of two of Megason's children.[2]

The evidence in this case is conflicting. Reviewed in the light most favorable to the State, the evidence shows that Megason's children, under the assumed name of M & M Moving, were hired by Government Records Services to move the books and shelves, that her children did no work in the move, that county employees and work-release inmates actually conducted the move, and that Megason submitted the invoices on behalf of M & M Moving despite having knowledge that the work for which she was submitting invoices had been done by county employees and work-release inmates, and that her children had done nothing to earn the money. The misuse of government service was allegedly using county employees to do work when she was receiving the money from a third party for the work.

The evidence further shows that Megason sent the first of the two invoices, in the amount of $1,800, to Government Records Services for payment on November 17, 1995, when her son was in college in Alpine, Texas, nearly 700 miles from the Bowie County Courthouse. She personally endorsed the check she received from Government Records Services, taking $700 in cash and placing the remaining $1,100 in her own checking account.

She sent the second invoice, in the amount of $2,500, to Government Records Services for payment on December 4, 1995, again while her son was in school in Alpine. Several days later, she deposited the check Government Records Services

issued for that work in her personal account.

Several deputy clerks and one inmate involved in the move testified that they had not seen Megason's children take any part in the move, either moving the shelving or the books, during business hours. The deputy clerks also testified that, because of the way the books were stacked, they could tell that no other person had moved any of the books while they were not present. There was also testimony that the children had no part in moving the shelving to the basement.

Megason testified that her children had moved at least one third to one half of the 1,000 file books and at least one third to one half of the sixteen rows of shelving. She also testified that she deposited the money in her personal bank account because her children could not manage it.

Megason's contention on appeal is narrow. She contends that there was no proof of the value of the services that she allegedly misused. Megason takes the position that the value of the money was not the key, but rather the value of the "use of the thing allegedly misused." She contends that the evidence does not show that she misused government services (work performed by county employees and work-release inmates) valued at more than $1,500 on any single occasion, and that the law does not permit aggregation of the amounts.

In support of that position, she cites two cases involving theft convictions in which the indictment did not allege aggregation, and the State did not prove theft over the threshold amount on any particular day. *Thomason v. State*, 892 S.W.2d 8 (Tex. Crim.App.1994); *Washington v. State*, 909 S.W.2d 577 (Tex.App.-Corpus Christi 1995, no pet.).

2. The company was an assumed name entity, which was filed in the assumed name records

of the clerk's office by Megason.

**887**

In each of those cases, however, the courts relied on the theft aggregation statute set out at Tex. Pen.Code Ann. § 31.09 (Vernon 1994). That section states that it applies only to that chapter and thus cannot apply to a prosecution under Chapter 39 of the Penal Code. Further, the Court held in *Talamantez v. State*, 829 S.W.2d 174, 177–81 (Tex.Crim. App.1992), that the official misconduct penal statutes were unique unto themselves. Thus, the reasoning set out in theft aggregation cases cannot directly apply to this type of prosecution.

We must therefore decide whether in the present case the State proved that Megason misused services in the value of more than $1,500 on "or about" the two particular dates set out in the indictment. The indictment contains language alleging that Megason committed the unlawful act "on or about" two specified dates. The State is not required to allege a specific date in an indictment. *Mitchell v. State*, 168 Tex.Crim. 606, 330 S.W.2d 459, 462 (1959). The "on or about" language is sufficient, so long as the act occurred before the date of the presentation of the indictment, but within the relevant limitations period. *Sledge v. State*, 953 S.W.2d 253, 256 (Tex.Crim.App.1997); *Thomas v. State*, 753 S.W.2d 688, 692 (Tex. Crim.App.1988).

The jury charge reflects this rule. It defined the "on or about" language as "any time within the 3 year period immediately preceding February 26, 1998," which was the date of the indictment.

The court in *Talamantez* held that misuse by a county commissioner of earthmoving equipment for personal purposes could be measured in value for the duration of the misuse. In that case, the court applied the sum of the value of the use of the equipment over a period of months. The discussion in *Talamantez* demonstrates that a public official may be tried and convicted for misapplication of anything of value over a period of time.

There are two different matters involved in the present case: (1) the misuse of the services of governmental employees, which occurred over a period of at least several weeks, and possibly several months; and (2) the obtaining by Megason of money for that misuse on two separate dates.

Megason's use of county employees and inmates to do county work was not a wrongful act in itself, but selling those services by obtaining payment from a third party for that work under the guise that her children had done the work was a wrongful act. The performance became private acts in the sense that the work was contracted to be done by a third party (M & M Moving, being Megason's children).

There was evidence of the value of the work done by the county employees and inmates, for which Megason was paid. Bob Summers, a representative of Government Records Services, testified that he believed the value of the move was $16,-000. James Pinner, another of Megason's witnesses, testified that the value of the move was over $12,000. (Gary Dean, a State's witness, testified that he estimated the total cost of such a move at $2,620.)

None of the foregoing evidence, however, breaks the work down into two periods as indicated by the indictment, which alleges that Megason received the value of services of $1,500 or more, but less than $20,000 for private work for Government Records Services on or about November 21, 1995, and of $1,500 or more, but less than $20,000, for private work on or about December 14, 1995.

No one but Megason knew exactly what time and work was included in this dichotomy. An invoice was sent by Megason under the name of M & M Moving dated November 17, 1995, for "Moving books and files in County Clerks [sic] office." There was evidence that some of the work had been done prior to that date, but this invoice could also have included work done after that date. The lack of specificity conceals any information about exactly what work was covered by this invoice.

The same applies to the invoice that Megason sent dated December 4, 1995, which states "Moving files in County Clerks [sic] office." The amount of that invoice is $2,500.

■ Government Records Services relied on the amounts of the invoices and paid separate checks for $1,800 dated November 21, 1995, and $2,500 dated December 14, 1995. Because Megason invoiced the company for those amounts and accepted the checks for those amounts, this is an admission on her part that this was the value of the work done and thus constitutes evidence of these values. This point of error is overruled.

## READING OF TESTIMONY TO THE JURY

Megason next contends that the trial court erred by not allowing a portion of the testimony of witness Bob Summers, the sales representative for Government Records Services, to be read to the jury. The jury request reads as follows:

[R]equest testimony of Bob Summers due to Jury's disagreement over the reasons that Bob Summers made the agreement with Bobby Gale Mitchelle [sic] [Marylene Megason's daughter] instead of Marylene Meganson [sic].

TEX.CODE CRIM. PROC. ANN. art. 36.28 (Vernon 1981) provides that when a jury disagrees about the statement of a witness it may have read to it from the court reporter's notes

[T]hat part of such witness testimony or the particular point in dispute, and no other....

■ When the jury asks that disputed testimony be read, the trial court must first determine if the jury's inquiry is proper under the cited statute. If it is proper, the trial court must then interpret the communication, decide what sections of the testimony will best answer the inquiry, then limit the re-reading accordingly. *Brown v. State,* 870 S.W.2d 53, 55 (Tex. Crim.App.1994). We are not to disturb the trial court's decision unless a clear abuse of discretion and harm is shown. *Id.; see Jones v. State,* 706 S.W.2d 664, 668 (Tex.Crim.App.1986).

In response to this request, the court had these two pages of testimony read to the jury:

Q. Now, you have testified that you made, in October of '95, an oral agreement with Bobbie Gail Mitchell.

A. Correct.

Q. How did you come to know there was something for you and Bobbie Gail Mitchell to make an agreement about?

A. Bobbie Gail Mitchell was a contract employee of ours and I had known her. I knew she did work. I knew at that time that work needed to get done and it needed to be—some help and assistance done on that project.

. . . .

Q. So you just looked out in the office and said this needs to be moved?

A. I call on the county once a month and it was very easy for me to visualize that there needed to be work done.

Q. Mr. Summers, are you saying that you did that on your own initiative without ever talking to Marylene Megason?

A. There was no discussion with Marylene Megason about this project.

Q. So, on your own, without any input from Marylene Megason, you struck up a conversation with Bobbie Gail Mitchell or entered into an oral agreement she would assist in the move?

A. Yes.

Q. But a move is a county clerk's job?

A. A move is the county's job.

Q. The county's job. But you undertook to enter into an agreement with Bobbie Gail Mitchell to do the county's job without ever talking to anybody at the county?

A. A portion of the job.

Q. A portion of the job? Is that your testimony?

A. To assist and help with a portion of the moving job, yes.

Q. And that was without you ever hearing from anybody in the county there was going to be a moving job?

A. No, I knew there was—that was already—the moving job was going to be.

Q. Well, how did you know that? That was my question.

A. With the talk within the county clerk's office.

. . . .

Q. With who?

A. The main thing was just the people within the office. Like my main contact at that time in talking about the move was actually Verble Kingston [a deputy clerk].

Q. So from your conversations with Verble Kingston you knew there was going to be a move in the office?

A. Yes.

Megason objected, asking that an additional portion of the testimony be read to the jury. The excluded reading was as follows:

Q. Did you know anything about M & M Movers?

A. No.

Q. Did you anticipate that Bobbie Gail Mitchell would fulfill her part of the agreement, and that is moving 25 percent of these books and shelves?

A. Yes, I had no problem with that at all.

Q. Did Government Records already have a relationship with Bobbie Mitchell?

A. Yes, we did.

Q. Would you tell the ladies and gentlemen of the jury what that relationship was?

A. Ms. Mitchell was a contract employee of Government Records Services and did a variety of things for us in the office like microfilming, tracing of books and just doing things that we needed to have done.

Q. And what type of employee was she?

A. Well, she was a very, very honest, very good employee. Did very quality work.

 The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the court acted without reference to any guiding rules or principles. The mere fact that a trial judge may decide a matter within its discretionary authority differently than an appellate judge does not demonstrate such an abuse. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990).

 First, no agreement or contract was established by testimony, reference, or written document showing that the county, the county clerk's office, or the county clerk ever contracted with anyone to move the books and shelves in question. The only agreement or contract on this move was between Government Records Services and M & M Moving. Therefore, the jury's request for the testimony of Bob Summers related to the agreement between Government Records Services and someone who would do the physical work of moving the books and shelves. The portion of the testimony that the trial judge allowed to be read to the jury dealt with how Summers knew that the books and shelves needed to be moved and how Summers happened to contact and enter into an oral agreement with Bobbie Gail Mitchell that she would assist in the move. Summers testified that he never talked to Megason about the contract.

The testimony that the judge refused to have read to the jury indicated that Summers believed that Bobbie Gail Mitchell was a very honest and good employee who did quality work. While this does not make a comparison between Mitchell and Megason, it does show a reason why Sum-

mers chose to make the agreement with Bobbie Gail Mitchell, which is a part of the question posed by the jury, i.e., testimony as to the reasons Summers made the agreement with Mitchell instead of Megason. The testimony actually read to the jury only refers to the fact that Summers did not discuss the matter with Megason and does not discuss any reason why he did not make the agreement with Megason. Thus, the testimony excluded from the jury was responsive to the jury's question. The trial court erred in refusing to allow it to be read to the jury.

■ We must next conduct a harmless error review. Any error that does not affect the substantial right of the defendant, unless it is constitutional error, must be disregarded. TEX.R.APP. P. 44.2. The portion of the testimony that was not re-read to the jury disclosed that Summers had knowledge of Mitchell being an honest, good employee who did quality work. Even if taken as the motivation for Summers selecting M & M Moving to do the work, the evidence showed that M & M Moving did not do the work. Megason's guilt is based on her having her employees and inmates of the county doing the work, Megason invoicing Government Records Services for $1,800 and $2,500 for the work, and/or Megason keeping the money. Even if Summers had contracted with Megason, the use of governmental employees to do the work for which she received the money from a third party was an illegal act; thus, why Summers chose M & M Moving, by which Bobbie Gail Mitchell was allegedly employed, would not be of significance in the outcome of the case, and this error did not affect Megason's substantial rights. Therefore, we conclude that this was harmless error.

The judgment of the trial court is affirmed.