PD-1086-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/23/2015 3:49:05 PM
Accepted 9/24/2015 3:55:53 PM
ABEL ACOSTA
CLERK

No. PD-1086-15

## TO THE COURT OF CRIMINAL APPEALS OF TEXAS

JEREMY THOMAS
*Appellant*

v.

THE STATE OF TEXAS,
*Appellee*

---

## PETITION FOR DISCRETIONARY REVIEW

---

On Petition For Discretionary Review from the First Court of Appeals Cause No. 01-11-00258-CR, affirming the judgment in Cause No. 1284896 from the 177th District Court, Harris County, Texas.

---

FILED IN
COURT OF CRIMINAL APPEALS

September 24, 2015

ABEL ACOSTA, CLERK

ALEXANDER BUNIN
Chief Public Defender
Harris County, Texas

SARAH V. WOOD
Assistant Public Defender
Harris County, Texas
Texas Bar Number 24048898
1201 Franklin, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278
Sarah.Wood@pdo.hctx.net

**Counsel for Appellant**

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                              Jeremy Thomas

TRIAL PROSECUTOR:                        Gretchen Flader
                                         Assistant District Attorney
                                         Harris County, Texas
                                         1201 Franklin, Suite 600
                                         Houston, Texas 77002

DEFENSE COUNSEL AT TRIAL:                Murray Newman
                                         405 Main, Suite 800
                                         Houston, Texas 77002

PRESIDING JUDGE:                         Hon. Kevin Fine
                                         177th District Court
                                         Harris County, Texas
                                         1201 Franklin, 19th floor
                                         Houston, Texas 77002

DEFENSE COUNSEL ON APPEAL:               Sarah V. Wood
                                         Assistant Public Defender
                                         Harris County, Texas
                                         1201 Franklin, 13th Floor
                                         Houston, Texas 77002

## TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................................ 2

Table of Contents ..................................................................................................... 3

Index of Authorities ................................................................................................. 4

Statement Regarding Oral Argument ...................................................................... 5

Statement of the Case ............................................................................................... 5

Statement of Procedural History ............................................................................. 5

Grounds For Review ................................................................................................. 6

   Ground One:   The First Court of Appeals erred by holding that erroneously omitting testimony from a jury's request for read-back would only be harmful if the excluded portion "contradicted" the selected excerpt.

   Ground Two:   The First Court of Appeals erred in holding that the trial court did not need to strike a juror who unequivocally said he could "not be fair" since he simultaneously said he could follow the law.

Argument ................................................................................................................... 6

  Reasons for Review .................................................................................................. 6

  Factual Background .................................................................................................. 6

  Ground One: Harm from Erroneous Read-back of Testimony ................................ 12

  Ground Two: Failure to Strike Unfair Venireperson ............................................... 15

Prayer for Relief ....................................................................................................... 17

Certificate of Service and Compliance .................................................................... 17

Appendix ................................................................................................................... 18

# INDEX OF AUTHORITIES

**Cases**

*Brown v. State*, 870 S.W.2d 53 (Tex. Crim. App. 1994) ..................................................... 14, 15

*Durrough v. State*, 562 S.W.2d 488 (Tex. Crim. App. 1978) ................................................... 16

*Fox v. State*, 283 S.W.3d 85 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) ........... 12

*Jones v. State*, 706 S.W.2d 664 (Tex. Crim. App. 1986) ......................................................... 13

*Pugh v. State*, 376 S.W.2d 760 (Tex. Crim. App. 1964). ......................................................... 13

*Ray v. State*, 178 S.W.3d 833 (Tex. Crim. App. 2005) ........................................................... 14

*Smith v. State*, 907 S.W.2d 522, (Tex. Crim. App. 1995) ......................................................... 16

**Statutes**

Tex. Crim. Proc. Code § art. 36.28. ................................................................................. 13

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument as it may aid this Court in the resolution of these interesting issues.

## STATEMENT OF THE CASE

Mr. Thomas pleaded not guilty but after a trial was convicted of murder by a jury. The trial court then sentenced him to life in prison. (3 R.R. at 6; Supp. C.R. at 9).

## STATEMENT OF PROCEDURAL HISTORY

Appellate counsel filed a motion for new trial based on an exculpatory eyewitness and, after a hearing, the trial court granted the motion. (C.R. at 6). The State appealed. (C.R. at 13). The court of appeals reversed the trial court's granting of the motion for new trial. *State v. Thomas*, 426 S.W.3d 233 (Tex. App. 2012). This Court then granted Mr. Thomas's PDR and ultimately affirmed. *State v. Thomas*, 428 S.W.3d 99 (Tex. Crim. App. 2014), reh'g denied (May 21, 2014). Mr. Thomas is now litigating the original direct appeal from the judgment of guilt which had been abated during the State's appeal.

The First Court of Appeals affirmed the conviction in a published opinion. *Thomas v. State,* _ S.W.3d_, 1-11-00258-CR, 2015 WL 4101164 (Tex. App.—Houston [1st Dist.]). No motion for rehearing was filed.

## GROUNDS FOR REVIEW

Ground One:  The First Court of Appeals erred by holding that erroneously omitting testimony from a jury's request for read-back would only be harmful if the excluded portion "contradicted" the selected excerpt.

Ground Two:  The First Court of Appeals erred in holding that the trial court did not need to strike a juror who unequivocally said he could "not be fair" since he simultaneously said he could follow the law.

## ARGUMENT

### Reasons for Review

The court of appeals has permitted such a departure from the accepted course of proceedings in the trial court as to call for this Court to exercise its supervisory capacity.

The court of appeals has decided a question of law in a way that conflicts with applicable decisions of this Court and the intermediate courts.

### Factual Background

Mr. Thomas was convicted of the murder of Keith Moses based on eyewitness identification testimony from Mr. Ochelata Reliford and Ms. Tranquena Johnson who were standing outside of Ochelata's nearby apartment when the shooting occurred amidst a group of people at about 11:00 p.m. in August of 2006 (3 R.R. at 13; 4 R.R. at 148; 5 R.R. at 171).

Defendant's Exhibit #1 (below) represents a partial map of the apartment complex, with the shooting having occurred in the doorway of the corner apartment marked with a faint circle at the bottom right of the page (6 R.R. at 48-49). Tranquena and Ochelata were standing in front of the apartment marked with Tranquena's name along the right. Witness Brandon Lusk was in the apartment in the center marked with "Lusk."



State's Exhibit #88 is a photo of the area, except that at the time of the incident, there was no roof-like carport. (R.R. 5 at 182). The hand-drawings on the photo show a box representing the car that witnesses Tranquena and Ochelata were standing around when the shooting occurred in the doorway of Keith's apartment beneath the tree.

Tranquena testified that on the night of the shooting she was visiting her close friend Ochelata. (4 R.R. at 151). When she exited the apartment to leave that night, she looked down the sidewalk and saw four people arguing in front of Keith's apartment — Keith, a lady, a man she testified at trial was Jeremy Thomas, and another

unidentified man in a white shirt. (4 R.R. at 162). The men had their backs to her and she could only see their darkened silhouettes and a flash of light when a gun fired. (4 R.R. at 189). She described the lighting as being poor, saying "it didn't really have any lights on that side… Other than the porch lights, that's pretty much it." (4 R.R. at 166). State's exhibit 11 shows the scene that night after the deceased was struck down in his open doorway (3 R.R. at 14-15).



When Trancquena heard the shots, she whirled around to try to get the children out of the car. (4 R.R. at 189). She then saw the person she identified at the time of trial as Jeremy Thomas run past and she believed he had a gun. (State's Exhibit #88; 4 R.R. at 193). Tranquena testified she recognized him because of the color of his skin, his clothing, and his hair. (4 R.R. at 205). Specifically, the man wore a black t-shirt and had short hair, which she agreed would fit the description of many people in the area. (4 R.R. at 193). At trial, she said she recognized him from living in the apartment above Ochelata. (4 R.R. at 167).

However, on the night of the shooting, Tranquena went to the station and spoke to the police and gave a different statement. When describing the shooter, she did not tell police that she recognized him and did not tell them that he lived upstairs from Ochelata, even though they specifically asked if she'd seen him before. (4 R.R. at 199-201). Trancquena also told police that the shooter was only 5'5" tall. (4 R.R. at 188). Jeremy Thomas is 5'11" tall. (4 R.R. at 189, 200).

Over a month later, Trancquena changed her story and told the police the person she thought was the shooter went by the nickname "Red." (4 R.R. at 198, 200, 201). She testified that, by that time, Ochelata had told her who he was and given her his name. (4 R.R. at 201). It was also discussed at trial that one afternoon after the murder, she had studied Mr. Thomas's appearance as he ate lunch on the balcony over-looking the murder scene. After familiarizing herself with his appearance and speaking with Ochelata, she picked him out in a photo lineup. (4 R.R. at 198, 200, 201).

The other witness, Mr. Ochelata Reliford, was a close friend to Tranquena and was familiar with Jeremy Thomas. (4 R.R. at 143). Ochelata sold weed and knew many of the guys in the neighborhood. (4 R.R. at 143-44). He knew that they all went by nicknames, though he got them confused, Although he testified at trial to having witnessed the shooting, he never informed the police until they questioned him five weeks later. (4 R.R. at 161). When asked on direct why he was testifying, he proclaimed, "Because it's the right thing to do." (4 R.R. at 203). Then on cross, he agreed that the

"real reason" was that "the police came and arrested you, took you on an airplane and flew you here." (4 R.R. at 204).

Ochelata testified to a different scenario than either Tranquena's statement or his own previous statements. (4 R.R. at 235). He said that as he and Tranquena were standing at the driver's door of her car, they both watched Jeremy Thomas and two other men walk down the staircase, arguing with Thomas's girlfriend. (4 R.R. at 231). He said he saw the group of three men walk to Keith's apartment where the door was closed. Even though everyone's backs were directly turned to him, he was able to see Thomas knocking with one hand and turning the door knob with the other, just before he walked in and shot the deceased. (4 R.R. at 149, 237). Ochelata also added still more unknown men to the scene, saying that 2 or 3 more guys were already standing near the door as the shooter knocked. (4 R.R. at 238-39). This would make a total of 5 or 6 men surrounding Keith's apartment, silhouetted with backlight, a significant element of the story that was never previously indicated by anyone. (4 R.R. at 236-38).

Also, when he gave his statement five weeks after the murder, he told the police that Carnell Meredith was at the scene, but at trial he insisted that it was actually Charles Amos. (5 R.R. at 212-13). Carnell Meredith had already been prosecuted for the murder and pled guilty based largely on Ochelata's previous identification which he then contradicted in this trial. (6 R.R. at 56).

Perhaps the most intriguing testimony at trial was from Brandon Lusk. He was employed as a bouncer at a local bar and worked nights, so he rarely associated with the

10

people in the apartment complex and was not familiar with Jeremy Thomas or the other young men. (4 R.R. at 125-26).

As he arrived home the night of the shooting, he passed Keith standing in front of his apartment with another man in a white shirt. (4 R.R. at 127). Lusk walked straight to his apartment and only three to four minutes later, he heard the gunshots. He peeked outside his door and witnessed a young man hurrying past with a gun in his hand. (4 R.R. at 129). As shown in Defense exhibit 1 (above), the gunman was fleeing through a completely different part of the apartment complex than where Tranquena and Ochelata allegedly saw the shooter.

An interesting part of Lusk's testimony was his description of the gunman: 5'5" with a black t-shirt — the precise description given of the gunman by Tranquena on the night of the shooting before later changing her story after speaking with Ochelata. (4 R.R. at 145-46). According to the only two witness statements given at the time of the murder, the gunman was "significantly shorter" than Mr. Thomas who was 5'11". (4 R.R. at 145).

After the jury found Mr. Thomas guilty, the sentence was to be decided by the court and the judge appeared unsure, stating, "I think that the -- under the circumstances, it would be difficult for anyone to make a positive identification at the time of the shooting… As to what Mr. Reliford may or may not have seen, I'm not sure anybody is sure." (7 R.R. at 50-51). However, he then immediately pronounced a life sentence when the State had only requested 50 years. (7 R.R. at 52).

**Ground One: Harm from Erroneous Read-back of Testimony**

The court of appeals found that it was error when the trial court failed to read back all of the testimony that was requested by the jury. The court then announced a confusing standard for determining whether harm resulted. First, it enunciated, "Error under article 36.28 is harmless 'where there is no variance between the direct testimony and cross-examination.'" *Thomas* at \*6 (quoting *Fox v. State*, 283 S.W.3d 85, 91 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd)). Then it concluded:

> Here, the portion of Johnson's cross-examination that appellant asserts the trial court should have read back to the jury does not contradict any of the three excerpts of Johnson's testimony that the trial court did read to the jury. Instead, the requested excerpt only provides the additional information that a female and a man in a white shirt were also present at the scene.

The court thus appears to conclude that "there is no variance" while at the same time explaining how the missing read-back did vary significantly from the selected excerpt by adding additional information.

The result of the court's reasoning is to establish precedent that—to be harmful—erroneously excluded read-back testimony must actually contradict the selected excerpt. Such a standard of review does not apply to the nature of the harm in this case and it cannot suffice as a general test in future cases.

The more cogent inquiry involves whether the trial court's response may have served to bolster the State's case unnecessarily. *See Jones v. State*, 706 S.W.2d 664, 668

(Tex. Crim. App. 1986); *Pugh v. State*, 376 S.W.2d 760, 762 (Tex. Crim. App. 1964). By primarily including the witness's description of the appellant at the scene and excluding other potential suspects in which the jury may have been interested, the response bolstered the State's case.

To require that the excluded testimony "contradict" the selected excerpt is needlessly restrictive. In this case, the jury communicated to the court that they needed additional information in order to render a true verdict. As the court of appeals concedes, the trial court failed to inform them that "a female and a man in a white shirt were also present at the scene." This had the effect of skewing the evidence by implying to the jury that the witness never saw these additional people.

This was an eyewitness identification case where the evidence indicated that a group of people were gathered around the scene. The defense was that it may have been one of the others who actually pulled the trigger and that the eyewitnesses may have incorrectly identified the appellant. As even the trial court remarked, "I think that the -- under the circumstances, it would be difficult for anyone to make a positive identification at the time of the shooting… As to what Mr. Reliford may or may not have seen, I'm not sure anybody is sure." (7 R.R. at 50-51).

Witnesses gave conflicting accounts of who was present at the scene. Mr. Reliford testified that, in addition to the shooter and the victim, four or five other men were in the group. (5 R.R. at 238, 247). Ms. Johnson testified about the man in the white shirt, the shooter in the black shirt, and the woman. Apparently, the jury believed this

information was important to their decision. Because this information was erroneously omitted, the accuracy of their verdict is suspect.

The law provides, "In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other…" Tex. Crim. Proc. Code § art. 36.28.

The trial court must first determine if the jury's inquiry is proper under Article 36.28. If it is proper, the trial court must then interpret the communication, decide what sections of the testimony will best answer the inquiry, then limit the re-reading accordingly. *Brown v. State*, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994).

When evaluating harm from non-constitutional error flowing from the exclusion of relevant evidence, we examine the record as a whole, and if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless. *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005).

By requesting this information, the jury deemed it important and substantial. If anything can be said to have affected the jury's verdict, it is the testimony that the jurors specifically asked to hear. The issue of the proper identification of the shooter—as opposed to the other individuals present at the scene—was the most important issue in the case. The jury's request for testimony confirms this. It was error to conclude that the error was not harmful just because the omitted testimony did not "contradict" the selected excerpt even though important information was left out thus implying that the

14

testimony never occurred.

**Ground Two: Failure to Strike Unfair Venireperson**

The court of appeals held that since venireperson #25 said he could follow the law, he needn't be struck for cause—even though he stated unequivocally that he could not be fair. The venireperson stated conclusively, "I would hold the State to their burden, but I don't think I could give him a fair trial." (2 R.R. at 132). To the court of appeals in this case, the ability to follow the law mooted any complaint about his simultaneous inability to be fair. This is an incorrect application of the law.

By statute, a prospective juror who "has a bias or prejudice in favor of or against a party in the case" is disqualified to serve as a juror. Tex. Gov't Code § 62.105(4). An impartial jury is defined as one which does not favor a party or an individual because of the emotions of the human mind, heart, or affections. It means that the defendant, the cause, and the issues involved in the cause must not be prejudiced. *Durrough v. State*, 562 S.W.2d 488, 489—90 (Tex. Crim. App. 1978).

As noted by the court of appeals, the venireperson stressed the fact that he believed the defendant looked like a "thug" and the trial court agreed (thus tainting and further prejudicing the potential juror). It is appropriate for this Court to take note of the modern parlance for the word "thug." Mainstream media outlets are discussing "thug" as a racial slur. *See, e.g.* David A. Love, "Calling People 'Thugs' Solves Nothing,"

CNN, May 5, 2015;[1] NPR host Melissa Block's interview on April 30, 2015 with John McWhorter, associate professor of English and comparative literature at Columbia University;[2] Judy Muller, "A Thug by Any Other Name, Huffington Post, February 6, 2009.[3]

As this Court held, "While a trial court may hold a juror qualified who states that he can lay aside an opinion he may have formed, no such discretion vests in the court with reference to a juror with a bias or prejudice against the parties." *Smith v. State*, 907 S.W.2d 522, 530 (Tex. Crim. App. 1995). The court of appeals clearly erred by deeming venireperson #25 qualified even though he unequivocally could not be fair. "When the feeling expressed by a prospective juror is one of bias or prejudice in favor of or against the defendant (as opposed to a bias or prejudice against the law), it is not ordinarily deemed possible for such a juror to be qualified by stating that he can lay aside such prejudice or bias." *Id.*

---

[1] Available at: http://www.cnn.com/2015/04/29/opinions/david-love-thugs-riot-shaming/
[2] Available at: http://www.npr.org/2015/04/30/403362626/the-racially-charged-meaning-behind-the-word-thug
[3] Available at: http://www.huffingtonpost.com/judy-muller/a-thug-by-any-other-name_b_155708.html. The author recounts:

> A young African-American woman in the group, a prominent activist, said she was offended when whites referred to Mugabe as a "thug." "But why?" asked the other (Caucasian) diners. Because, she responded, "thug" is a racist term. After a rather stunned silence, there were protests offered all around. The word "thug," we insisted, referred to all sorts of nefarious bullies, from muggers to Mafioso. The dictionary (once considered the final arbiter) defines thug as a "cruel or vicious ruffian, robber or murderer." The young woman did not budge. "Racist," she insisted. And she kindly suggested that our insensitivity could be chalked up to a generation gap.

## PRAYER FOR RELIEF

For the reasons stated above, the Appellant prays that this Court grant his petition, review the case, and hold that the Court of Appeals erred by affirming the conviction.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas


**/s/ Sarah V. Wood**
**SARAH V. WOOD**
Assistant Public Defender
Harris County Texas
1201 Franklin, 13th Floor
Houston Texas 77002
(713) 368-0016 (phone)
(713) 368-9278 (fax)
State Bar Number 24048898

## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that a copy of the foregoing petition for discretionary review has been served on the District Attorney of Harris County, Texas, by the efile service and to the State Prosecuting Attorney and that this petition has <u>2,943</u> words according to the computer program used to draft it.

**/s/ Sarah V. Wood**
**SARAH V. WOOD**

# APPENDIX

2015 WL 4101164
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,
Houston (1st Dist.).

Jeremy Thomas, Appellant
v.
The State of Texas, Appellee

NO. 01–11–00258–CR | Opinion issued July 7, 2015

**Synopsis**
**Background:** Defendant was convicted in the 177th District Court, Harris County, of first-degree felony murder. Defendant filed both a notice of appeal and a motion for new trial, and the trial court granted a new trial. The Court of Appeals abated defendant's appeal of his conviction while the State appealed the trial court's order granting a new trial. The Court of Appeals, 426 S.W.3d 233, reversed the order granting a new trial and reinstated defendant's conviction and sentence. The Court of Criminal Appeals, 428 S.W.3d 99, granted defendant's petition for discretionary review and affirmed. The Court of Appeals reinstated defendant's original appeal of his conviction.

**Holdings:** The Court of Appeals, Evelyn V. Keyes, J., held that:

[1] trial court erred by failing to read back testimony from witness's cross-examination by defendant, despite jury's request that court read only testimony from State's questioning of witness;

[2] trial court's failure to include the requested excerpt from witness's cross-examination in the reading to jury did not constitute harmful error;

[3] trial court did not abuse its discretion in denying defendant's motion to suppress witness's in-court identification; and

[4] trial court's remarks during voir dire, stating that defendant looked like a "thug" and that it was "fine" for a venireperson to think so as well, did not constitute fundamental error.

Affirmed.

**On Appeal from the 177th District Court, Harris County, Texas, Trial Court Case No. 1284896**

**Attorneys and Law Firms**

Sarah V. Wood, Assistant Public Defender, Houston, TX, for Appellant.

Devon Anderson, District Attorney, Dan McCrory, Assistant District Attorney, Houston, TX, for State.

Panel consists of Justices Keyes, Huddle, and Lloyd.

**OPINION**

Evelyn V. Keyes, Justice

**\*1** A jury convicted appellant, Jeremy Thomas, of the first-degree felony offense of murder, and the trial court assessed punishment at confinement for life.[1] Appellant filed both a notice of appeal and a motion for new trial, and the trial court granted a new trial. We abated appellant's appeal of his conviction while the State appealed the trial court's order granting a new trial. A panel of this Court reversed the order granting a new trial and reinstated appellant's conviction and sentence. *See* *State v. Thomas,* 426 S.W.3d 233 (Tex.App.–Houston [1st Dist.] 2012) ("*Thomas I* "). The Court of Criminal Appeals granted appellant's petition for discretion review and ultimately affirmed this Court's decision in *Thomas I. See* *State v. Thomas,* 428 S.W.3d 99 (Tex.Crim.App.2014) ("*Thomas II* "). We reinstated appellant's original appeal of his conviction, and appellant now contends that: (1) the trial court erred by failing to fairly interpret and respond to the jury's request for a reading of testimony during deliberations; (2) the trial court erred by denying his motion to suppress an eyewitness's in-court identification; (3) during voir dire, the trial court erred by stating that appellant looked like a "thug" and that it was "fine" for the prospective juror to believe that as well; and (4) the trial court erred by denying appellant's motion to strike the prospective juror from the venire.

We affirm.

**Background**

*A. Factual Background*

On August 3, 2006, the complainant, Vernon Keith Moses, was shot four times in the doorway of his apartment in southwest Houston. Before the shooting, Brandon Lusk passed by Moses' apartment on the way to his own apartment located further inside the complex, saw that Moses appeared agitated, and spoke with him briefly. Several minutes after he returned to his own apartment, Lusk heard three or four gunshots. He opened his front door and saw a young man walk quickly past, holding up his shorts with one hand and holding a pistol in his other hand. Lusk could not identify this man.

Maria Coronado lived next door to appellant in the apartment building perpendicular to Moses' apartment building. On the night of the shooting, Coronado heard arguing outside, and from her window she could see appellant and one of his friends arguing with Moses in front of Moses' apartment. Coronado saw appellant and his friend walk upstairs to appellant's apartment before going "right back downstairs." Coronado heard four or five gunshots, but she did not see who fired the shots. She then saw appellant and his friend run away, but she could not remember the direction in which they fled from Moses' apartment. She later identified appellant in a photo-array as being present at the shooting.

At the time of the shooting, Trancquena Johnson was at the apartment complex visiting her friend, Ochelata Reliford, who lived in the same apartment building as appellant and Coronado. Johnson recognized appellant as someone she had seen at the complex on previous occasions, but she did not know his name. She saw appellant, another man, a woman, and Moses arguing in front of Moses' apartment. Johnson went inside Reliford's apartment, but then, about five minutes later, she decided to return home, and she walked outside with her daughter, her godson, and Reliford. While outside, she saw the same four people arguing at Moses' apartment. Johnson saw appellant raise a gun and shoot at Moses. Appellant then ran past her with what appeared to be a gun in his hand. Johnson testified that she got a "good look" at appellant and that she recognized him from having seen him around the apartment complex before. Johnson also identified appellant in a photo-array.

19

**\*2** Reliford saw appellant at several points during the day on August 3, 2006. He saw appellant hanging out with a few other men that morning, he saw appellant "having a confrontation" with his girlfriend, Ciarra Vallery, later in the day, and he saw appellant have periodic arguments with Moses throughout the day. That evening, when Johnson was leaving his apartment, Reliford saw Vallery at the apartment she shared with appellant, crying and saying, "Don't do this." Appellant then walked to Moses' apartment and shot Moses in the head when Moses answered the door. Reliford saw appellant and three or four other men run past where he stood with Johnson, and he saw appellant with a gun in his hand when he ran past. Reliford also identified appellant in a photo-array and in court. He testified that he identified appellant "because he's the guy that shot [Moses] and took his life."

### B. Procedural Background

Appellant filed a pre-trial motion to suppress Reliford's in-court identification of him. Appellant argued that Houston Police Department ("HPD") officers improperly administered a photo-array containing his picture to several alleged eyewitnesses because the officers "used the same photospread when showing them to witnesses, and all witnesses ... signed their acknowledgement of their selection in the same location on said photo spread." Appellant argued that this process "create[d] an improper confirmation to each individual witness that they have selected the individual in the photospread that other witnesses had done" and tainted any subsequent in-court identification. Reliford was the fourth witness to view the photo-array, identify appellant as the shooter, and then sign his name on the back of the photo-array indicating that he had selected appellant. The trial court denied the motion to suppress.

During voir dire, defense counsel informed the venire about the presumption of innocence and stated, "If you feel it, even if it's just something in the pit of your stomach, you're thinking 'I'm already kind of leaning towards him being guilty,' please speak up now, because now is the time to do it." Defense counsel asked each row if anyone felt that way, and Venireperson No. 25 raised his hand. Defense counsel and the venireperson had the following exchange:

> [Defense counsel]: Juror No. 25, you think you couldn't give him a 100 percent fair trial?
>
> Venireperson: Probably not.
>
> [Defense counsel]: Would you not hold the State to their burden of proof?
>
> Venireperson: No, I would hold the State to their burden, but I don't think I could give him a fair trial.

As soon as defense counsel finished questioning the venire, the trial court dismissed the venire to take a break and called Venireperson No. 25 up to the bench for an on-the-record discussion. The trial court and Venireperson No. 25 then had the following exchange:

> The Court: You said based on [appellant's] looks you could not give him a fair trial?
>
> Venireperson: Yes, sir.
>
> The Court: But you also said that you could follow the law and you said you would hold the State to its burden of proof beyond a reasonable doubt?
>
> Venireperson: Yes. Just based on his looks alone, he looks like a thug.
>
> The Court: That's fine. I don't disagree with that. In fact, I agree with that. The question is, can you follow the law and hold the State to its burden of proof and listen to the evidence?
>
> Venireperson: Yes, I can.

After Venireperson No. 25 returned to his seat, the trial court stated, "All right. He's in." Defense counsel did not object to the trial court's comments at this time. The trial court then denied defense counsel's attempt to challenge Venireperson No. 25 for cause. Defense counsel requested three additional peremptory strikes, specifically noting that the trial court refused to strike Venireperson No. 25 for cause, which required him to exercise a peremptory strike.

The trial court denied this request.

**\*3** During deliberations, the jury foreman sent a note to the trial court requesting the court to provide "all transcripts of the case." The trial court sent the jury a form stating that the jury needed to certify that it was in disagreement as to the statement of a witness and it needed to indicate the specific point of dispute. The jury filled out the form as follows:

Name of witness whose statement is subject to disagreement:

*Tranquena [sic ] Johnson*

Lawyer questioning witness at time of statement:

*State*

Statement in dispute:

*With respect to the people outside Mr. Moses's apartment immediately prior to the shooting, we are in dispute as to the number of people present and the respective colors of their shirts.*

The trial court brought the jury back into the courtroom and had the court reporter read the following testimony to the jury on the record:

Question: "Then, what happened?"

Answer: "And as I was getting them from the car, the defendant ran past me."

Question: "What did you notice about him, as he ran by?"

Answer: "I noticed him because of me seeing him prior. And there's nothing specific that I noticed. What he was wearing and that, you know, I had seen him before."

Question: "What was he wearing?"

Answer: "A black T-shirt. I don't really remember shoes or anything like that."

\* \* \* \* \*

Question: "So there were four people total that you saw outside that apartment?"

Answer: "Yes."

\* \* \* \* \*

Question: "And as you're looking there, how many people can you see standing there arguing?"

Answer: "Four."

The trial court then concluded the reading and sent the jury back to continue its deliberations.

After the jury returned to deliberate, the trial court stated that defense counsel had timely objected prior to the reading of testimony and had requested that a portion of Johnson's cross-examination be included in the reading. The trial court allowed defense counsel to state his objection on the record, and defense counsel stated,

> I wanted there to be the inclusion of any testimony and not just in direct, but to also add anything from cross and any type of redirect, any issue under the cross-examination or direct of Trancquena Johnson relating to the number of people. I ask that it be included in its entirety.

Defense counsel did not object to the reading on any other basis. The trial court stated that it overruled the objection

"based strictly on the request of the jury," as the jury "made a very specific request" as to which witness's testimony "and they went on to narrow that to questions asked by the State."

The jury ultimately found appellant guilty of murder, and the trial court assessed punishment at confinement for life.

#### Reading of Testimony during Deliberations

In his first issue, appellant contends that the trial court's instruction to the jury concerning requests to have testimony read back to it during deliberations was erroneous because the instruction required the jury to narrow its request to questions posed by one attorney to one witness and that the trial court then "provided the jury with an incomplete and misleading portion of testimony." Specifically, appellant argues that the form provided to the jury improperly limited the testimony that the jury could request, that the trial court should have read testimony from Reliford that was responsive to the jury's request, and that the court improperly included testimony in the reading that was not responsive to the request.

**\*4** [1] [2] [3]Code of Criminal Procedure article 36.28 provides that "if the jury disagree[s] as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other ..." TEX. CODE CRIM. PROC. ANN. art. 36.28 (Vernon 2006); *Howell v. State,* 175 S.W.3d 786, 790 (Tex.Crim.App.2005) ("This statute seeks to balance our concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have."). After determining that the jurors dispute a portion of testimony, the trial court must "strike a balance between reading too much or too little testimony in response to the jury's request." *Arnold v. State,* 234 S.W.3d 664, 676 (Tex.App.–Houston [14th Dist.] 2007, no pet.); *see also Fox v. State,* 283 S.W.3d 85, 89 (Tex.App.–Houston [14th Dist.] 2009, pet. ref d) ("If [the jury request] is proper, the trial court must then interpret the communication, decide what sections of the testimony will best answer the inquiry, then limit the rereading accordingly."). We review the trial court's ruling on the jury's request to review disputed testimony for an abuse of discretion. *Arnold,* 234 S.W.3d at 676. "When the jury requests the reading of only a specific and limited portion of testimony, the trial court does not abuse its discretion by providing only the requested information." *Id.* at 677.

Here, during deliberations the jury informed the trial court that it had a dispute about testimony. The trial court provided the jury with a pre-printed form for the jury foreperson to fill out. The jury foreperson filled out the form as follows:

Name of witness whose statement is subject to disagreement:

*Tranquena* [*sic* ] *Johnson*

Lawyer questioning witness at time of statement:

*State*

Statement in dispute:

*With respect to the people outside Mr. Moses's apartment immediately prior to the shooting, we are in dispute as to the number of people present and the respective colors of their shirts.*

The trial court brought the jury back into the courtroom and had the court reporter read the following selections of testimony:

Question: "Then, what happened?"

Answer: "And as I was getting them from the car, the defendant ran past me."

Question: "What did you notice about him, as he ran by?"

Answer: "I noticed him because of me seeing him prior. And there's nothing specific that I noticed. What he was wearing and that, you know, I had seen him before."

Question: "What was he wearing?"

Answer: "A black T-shirt. I don't really remember shoes or anything like that."

* * * * *

Question: "So there were four people total that you saw outside that apartment?"

Answer: "Yes."

* * * * *

Question: "And as you're looking there, how many people can you see standing there arguing?"

Answer: "Four."

The trial court then sent the jury back for further deliberations.

Outside the presence of the jury, the trial court stated that defense counsel had objected before the testimony was read back to the jury, and it allowed counsel to state his objection on the record. Defense counsel objected as follows:

> I wanted there to be the inclusion of any testimony and not just in direct, but to also add anything from cross and any type of redirect, any issue under the cross-examination or direct of Trancquena Johnson relating to the number of people. I ask that it be included in its entirety. I made the objection and the Court overruled it.

The trial court stated that it overruled the objection "based strictly on the request of the jury. The jury made a very specific request as to the witnesses—which witness' testimony and they went on to narrow that to questions asked by the State." Defense counsel did not object on any other basis.

[4]Complaints about error in the reading of trial testimony to the jury during deliberations "must be preserved by objection at the time of the reading." *Hollins v. State,* 805 S.W.2d 475, 476 (Tex.Crim.App.1991); *Heller v. State,* 279 S.W.3d 823, 825 (Tex.App.–Amarillo 2008, no pet.). A timely objection provides the trial court with an opportunity to correct the error. *Hollins,* 805 S.W.2d at 476. Furthermore, the complaint on appeal must comport with the objection made at trial. *Yazdchi v. State,* 428 S.W.3d 831, 844 (Tex.Crim.App.2014); *Neal v. State,* 108 S.W.3d 577, 579 n. 2 (Tex.App.–Amarillo 2003, no pet.) ("Appellant also contends that reading the additional testimony was prejudicial and bolstered the State's case. However, before the trial court, he only objected on the ground that the matter the court proposed to read exceeded the scope of the certification. Because the objections about the prejudicial nature of the testimony and bolstering were not raised below, they are waived.").

**\*5** [5]At trial, defense counsel objected to the reading on the basis that the trial court ought to include testimony from Trancquena Johnson on both direct and cross-examination concerning the number of people present at the time of the offense. Defense counsel did not object that the form provided by the trial court to the jury improperly limited the portions of testimony that the jury could request, that the trial court should have included Reliford's testimony concerning the number of people present in the reading, or that the reading exceeded the scope of the jury's request

by including Johnson's testimony that she saw appellant run past her. On appeal, however, appellant raises all four of these arguments: that the trial court should have included testimony from the cross-examination of Johnson, that the trial court improperly limited the portions of testimony the jury could request, that the trial court should have included Reliford's testimony, and that the reading exceeded the scope of the request.

We conclude that appellant's complaint on appeal does not comport with his trial objection, and to the extent he complains about matters other than the fact that the reading did not include excerpts from Johnson's cross-examination, he has failed to preserve these complaints for appellate review. *See Yazdchi,* 428 S.W.3d at 844; *Hollins,* 805 S.W.2d at 476; *see also May v. State,* 139 S.W.3d 93, 100 (Tex.App.–Texarkana 2004, pet. ref'd) ("The jury specifically asked for the defense's questions on the topic. The court read back the State's questions and the detective's answers before moving to the defense's questions and the answers. This is obvious error. It was not, however, preserved for our review. Complaints about error in the reading of trial testimony must be preserved by objection at the time of the reading. There was no timely objection; thus, we may not address this issue on the merits.") (internal citations omitted).

The only complaint that appellant preserved was whether the trial court erred by failing to read back testimony from Johnson's cross-examination.[2] We turn, therefore, to this argument. In *Fox,* the trial court provided a template form to the jury for requesting the reading of disputed testimony similar to the one used in this case. 283 S.W.3d at 89. The jury filled out the form and indicated that it wished to hear the State's direct examination of the complainant because it disputed the complainant's "description of the abuse, what he saw, and where he went to [sic]." *Id.* The trial court read back portions of the complainant's direct examination in which he described two incidents of abuse, but it did not read back portions of the complainant's cross examination that contradicted his testimony on direct. *Id. at 90.* Our sister court held that "[b]ecause the jury requested testimony in which the complaining witness described what happened, what he saw, and where he went, appellant's cross-examination proffer was responsive to the jury's request" and that, therefore, the trial court erred in refusing to read those portions of testimony to the jury. *Id. at 90–91.* The court then concluded that because the testimony on cross-examination "varied from the statements made on direct examination and the conflicting statements were highly probative of appellant's guilt," the error was harmful. *Id. at 91* (citing *Jones v. State,* 706 S.W.2d 664, 668 (Tex.Crim.App.1986)).

**\*6** [6]Here, the trial court read three excerpts of Trancquena Johnson's testimony to the jury, one of which, the last excerpt, does come from appellant's cross-examination of Johnson. Appellant argues that the trial court erred by not reading back the testimony that directly followed the last excerpt, in which Johnson testified:

[Defense counsel]: How many people—how many people do you see there whether they're arguing or not?

[Johnson]: Four.

[Defense counsel]: All right. And so you have the female?

[Johnson]: Yes.

[Defense counsel]: The person who's about to be shot?

[Johnson]: Yes.

[Defense counsel]: And a person in a black shirt and in a white shirt, correct?

[Johnson]: Correct.

This testimony is responsive to the jury's request, and, despite the jury's request that the court read only testimony from the State's questioning of Johnson, the trial court should have read the additional testimony as well and erred in

failing to do so. *See id. at 90–91*; *see also Jones, 706 S.W.2d at 667–68* (holding that trial court erred in failing to read excerpts from cross-examination of witness even though jury note specified to "[s]end [the jury] court records from the DA's questions"). We therefore must consider whether this failure constitutes harmful error. *See Fox, 283 S.W.3d at 91*.

[7] [8]Error under article 36.28 is harmless "where there is no variance between the direct testimony and cross-examination." *Id.*; *see also Megason v. State, 19 S.W.3d 883, 890 (Tex.App.–Texarkana 2000, pet. ref'd)* (holding that when trial court erroneously refuses to read back portion of testimony to jury, appellate court conducts harmless error review and that, under such review, appellate court must disregard any error that does not affect substantial rights of defendant). Here, the portion of Johnson's cross-examination that appellant asserts the trial court should have read back to the jury does not contradict any of the three excerpts of Johnson's testimony that the trial court did read to the jury. Instead, the requested excerpt only provides the additional information that a female and a man in a white shirt were also present at the scene.

In light of the unobjected-to portion of the testimony that the court read back to the jury indicating that Johnson saw appellant, who was wearing a black shirt, run past her, the trial court's omission from the reading of Johnson's testimony that a female and a man in a white shirt were also present at Moses' apartment does not affect appellant's substantial rights. *See Megason, 19 S.W.3d at 890* (holding that excerpt that trial court did not read back "would not be of significance in the outcome of the case, and [therefore] this error did not affect Megason's substantial rights"); *cf. Fox, 283 S.W.3d at 91* ("Because the statements elicited by defense counsel on cross-examination varied from the statements made on direct examination and the conflicting statements were highly probative of appellant's guilt, the trial court's error is harmful."). We hold that the trial court's failure to include the requested excerpt from Johnson's cross-examination in the reading to the jury does not constitute harmful error. *See TEX. R. APP. P. 44.2(b)* ("Any [nonconstitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

**\*7** We overrule appellant's first issue.

### Admission of In–Court Identification

In his second issue, appellant contends that the trial court erroneously denied his motion to suppress Reliford's in-court identification of him because the pre-trial identification procedure was impermissibly suggestive and tainted Reliford's in-court identification.

We review the trial court's denial of a motion to suppress evidence for an abuse of discretion. *Shepherd v. State, 273 S.W.3d 681, 684 (Tex.Crim.App.2008)* (citing *State v. Dixon, 206 S.W.3d 587, 590 (Tex.Crim.App.2006)*). When we review a trial court's denial of a motion to suppress, we give "almost total deference to a trial court's express or implied determination of historical facts" and review de novo the court's application of the law to the facts. *Id.* We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State, 214 S.W.3d 17, 24 (Tex.Crim.App.2007)* (quoting *State v. Kelly, 204 S.W.3d 808, 818 (Tex.Crim.App.2006)*). The trial court is the "sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony." *St. George v. State, 237 S.W.3d 720, 725 (Tex.Crim.App.2007)*. The trial court may choose to believe or disbelieve any part or all of a witness's testimony. *Green v. State, 934 S.W.2d 92, 98 (Tex.Crim.App.1996)*. We sustain the trial court's ruling only if it is reasonably supported by the record and

correct on any theory of law applicable to the case. *Laney v. State,* 117 S.W.3d 854, 857 (Tex.Crim.App.2003).

[9] [10] [11]We review de novo the trial court's ruling on whether the suggestiveness of a pre-trial photo-array may have influenced an in-court identification. *Gamboa v. State,* 296 S.W.3d 574, 581 (Tex.Crim.App.2009); *Mendoza v. State,* 443 S.W.3d 360, 363 (Tex.App.–Houston [14th Dist.] 2014, no pet.). "An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification." *Gamboa,* 296 S.W.3d at 581 (quoting *Loserth v. State,* 963 S.W.2d 770, 771–72 (Tex.Crim.App.1998)). Courts use a two-step analysis to determine the admissibility of an in-court identification: (1) whether the out-of-court identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *Conner v. State,* 67 S.W.3d 192, 200 (Tex.Crim.App.2001).

[12]In determining whether the pretrial identification procedure was so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification," we consider the totality of the circumstances. *Gamboa,* 296 S.W.3d at 581–82 (quoting *Loserth,* 963 S.W.2d at 772); *Mendoza,* 443 S.W.3d at 363 ("If the pretrial procedure is found to be impermissibly suggestive, identification testimony would nevertheless be admissible where the totality of the circumstances shows no substantial likelihood of misidentification."); *Burkett v. State,* 127 S.W.3d 83, 88 (Tex.App.–Houston [1st Dist.] 2003, no pet.) ("If sufficient indicia of reliability outweigh suggestiveness, then an identification is admissible."). Factors that we consider in making this determination are: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the time of the confrontation; and (5) the length of time between the offense and the confrontation. *Gamboa,* 296 S.W.3d at 582.

**\*8** [13] [14]"[I]t is well established that, even where the pre-trial identification procedure is impermissibly suggestive, in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification." *Lesso v. State,* 295 S.W.3d 16, 25 (Tex.App.–Houston [1st Dist.] 2009, pet. ref'd) (stating such in context of overruling claim of ineffective assistance based on failure to move to suppress in-court identification of defendant); *Rojas v. State,* 171 S.W.3d 442, 449 (Tex.App.–Houston [14th Dist.] 2005, pet. ref'd) ("[W]hen an in-court identification is based upon knowledge independent from the allegedly improper pre-trial procedure, it is admissible."). An appellant must show by clear and convincing evidence that the in-court identification has been irreparably tainted to obtain reversal. *Mendoza,* 443 S.W.3d at 363.

Here, police officers showed Reliford a series of photo-arrays, one of which contained appellant's picture. Reliford was the fourth person to view the particular photo-array at issue. Trancquena Johnson, Mickie Ebermann,[3] and Maria Coronado had all viewed the photo-array before Reliford, identified appellant in the number 3 position in the photo-array, and placed their signatures on the back of the photo-array in the number 3 position. Reliford then viewed the photo-array, identified appellant in the number 3 position, and placed his signature on the back of the photo-array in the number 3 position. The State acknowledges that "providing a witness such as Reliford the opportunity to learn that other witnesses have identified the same person in a photo array may be impermissibly suggestive" and concedes that appellant may have satisfied the first step in the analysis—whether the identification procedure used was impermissibly suggestive.[4] However, even if the identification procedure used in this case was impermissibly suggestive, appellant still was required to demonstrate, by clear and convincing evidence, that the identification procedure was so suggestive that it gave rise to a "substantial likelihood of irreparable in-court misidentification" and that the witness's in-court identification was unreliable based on the totality of the circumstances. *See Mendoza,* 443 S.W.3d at 363; *Burkett,* 127 S.W.3d at 88.

[15]The first factor to consider in determining the likelihood of irreparable in-court misidentification is the witness's opportunity to view the defendant at the time of the crime. *See Gamboa,* 296 S.W.3d at 582. Reliford testified that he met appellant within a week of his moving to the apartment complex in June 2006, and he had therefore known appellant for nearly two months at the time of the offense. Reliford saw appellant around the complex on several occasions throughout the day of the shooting, including several instances in which Reliford saw appellant arguing with Moses, the complainant. Around 10:30 p.m. on the night of the offense, Reliford was outside and saw appellant with his girlfriend Vallery, who was crying and saying, "[D]on't do this." Appellant was facing Reliford, and Reliford testified that he recognized appellant and that he "[got] a good look at him." Appellant walked away from Vallery, and Vallery's shouts and crying drew Reliford's attention to her and appellant. Reliford then witnessed appellant walk to Moses' apartment, pull out a gun, and shoot Moses in the head. Reliford testified that, although appellant's back was turned at the time he shot Moses, he had not lost sight of appellant from the time he saw appellant descend the stairs to the time appellant approached Moses' apartment. After the shooting, Reliford witnessed appellant run toward where he was standing with Johnson. Reliford kept his eye on appellant and saw appellant run past him with a gun in his hand. Reliford thus had ample opportunity to view appellant at the time of the offense. *See Burkett,* 127 S.W.3d at 88 (noting that complainant testified that she "got a good look at [appellant]" and that complainant had adequate opportunity to view perpetrator).

**\*9** The second factor we consider is the witness's degree of attention at the time of the offense. *See Gamboa,* 296 S.W.3d at 582. Reliford testified that, before the offense occurred, he had been outside talking to Johnson by her car. While they were outside, Vallery and appellant began arguing loudly, with Vallery "crying and hollering loud." Reliford testified that Vallery and appellant's discussion, due to its volume, "drew the attention away from [Reliford's] and Ms. Johnson's conversation. We then turned and focused our attention on the two of them. Upon focusing our attention on them, [appellant] proceeded down the sidewalk toward [Moses'] apartment." Reliford kept his eyes on appellant from the time appellant walked down the stairs from his apartment to the time he ran past Reliford and Johnson after having shot Moses. Reliford thus paid a high degree of attention to appellant, a man with whom he was acquainted, at the time of the offense.

The third factor is the accuracy of the witness's prior description of the defendant. *See id.* The record provides no indication that Reliford gave a description of the shooter or anyone involved in the offense prior to viewing the photo-array. This factor, therefore, is neutral in the analysis of the likelihood of irreparable misidentification.

The fourth factor is the witness's level of certainty at the time of the confrontation. *See id.* Reliford was consistent in unequivocally identifying appellant as the shooter. When HPD Sergeant J. Brooks showed Reliford the photo-array, Reliford identified appellant and told Sergeant Brooks, "[T]hat's Red, that's the person that shot the victim [Moses]." Reliford also told Sergeant Brooks that appellant "ran past him with the gun in his hand and [appellant] looked right at [Reliford] and he was positive that Red was the person that shot and killed [Moses]." Sergeant Brooks testified that he had not told Reliford that the suspect was named "Red," that Reliford was the one who provided information to the officers concerning appellant's physical characteristics, such as a surgical scar on his stomach and paralysis in one of his hands, and that Reliford was "adamant" in his identification of appellant.

Reliford identified appellant in court as the shooter, and he testified that he identified appellant both as "somebody that [he] had seen before" and as "the person that [he] saw shooting the complainant." He stated, "I recognized [appellant] as the shooter. And I recognized him—I knew him as the shooter because I saw him doing the shooting. And I recognized him in the photo spread because he was the shooter." Reliford then further stated that he was identifying appellant in-court as the shooter "[b]ecause he's the guy that shot [Moses] and took his life."

Reliford thus unequivocally identified appellant as the shooter, both at the time he viewed the photo-array and at trial. *See Burkett,* 127 S.W.3d at 89 ("[T]he level of the complainant's certainty as to her identification of appellant was consistently high. When the complainant was shown the photographic array, she identified appellant as the perpetrator immediately and without hesitation. She also unequivocally identified appellant as the perpetrator of the offense during the identification suppression hearing and at trial.").

Finally, the fifth factor to consider is the length of time between the offense and the confrontation. *See Gamboa,* 296 S.W.3d at 582. Here, the offense occurred on August 3, 2006. Reliford viewed the photo-array on September 11, 2006, or thirty-nine days later. However, Reliford did not testify at trial until March 16, 2011, nearly four-and-a-half years after the offense. A lengthy passage of time between the offense and the in-court identification does not, however, necessarily detract from the in-court identification when the witness can recall details and is consistent in his testimony. *See Delk v. State,* 855 S.W.2d 700, 707 (Tex.Crim.App.1993) (holding that eighteen-month time period between offense and trial did not detract from identification "given the details [the witness] was able to recall and the consistency in her testimony"); *Burkett,* 127 S.W.3d at 89 (noting that six-month period of time "did not detract from the complainant's identification in this case because of her consistent testimony and ability to recall details).

**\*10** Here, the length of time between the offense and the trial was nearly four-and-a-half years, significantly longer than the time period in either *Delk* or *Burkett.* However, as we have noted, Reliford was able to describe the offense in detail, and he consistently displayed a high degree of certainty that appellant was the perpetrator of the offense. Furthermore, Reliford testified at trial that he identified appellant in court as the shooter "[b]ecause he's the guy that shot [Moses] and took his life," thus indicating that his in-court identification of appellant was based on what he witnessed on the day of the offense and not on viewing the photo-array.

*See Burkett,* 127 S.W.3d at 89 ("Moreover, the complainant testified that her in-court identification of appellant was based on what she had observed on the day of the offense, and not on her observation of the photographic array."); *see also Rojas,* 171 S.W.3d at 449 ("[W]hen an in-court identification is based upon knowledge independent from the allegedly improper pre-trial procedure, it is admissible.").

When we consider all of the relevant factors, we conclude that the totality of the circumstances supports the trial court's decision to allow Reliford to identify appellant in court as the shooter. *See Burkett,* 127 S.W.3d at 89. Appellant did not meet his burden of establishing, by clear and convincing evidence, that allowing Reliford, after he identified appellant in a pre-trial photo-array, to see that three other witnesses had also identified appellant after viewing the photo-array did not create a "very substantial likelihood of irreparable misidentification." *See Gamboa,* 296 S.W.3d at 582; *Burkett,* 127 S.W.3d at 89. We hold that the trial court did not abuse its discretion in denying appellant's motion to suppress Reliford's in-court identification.

We overrule appellant's second issue.

### Statements during Voir Dire

[16]In his third issue, appellant contends that the trial court erred by stating during voir dire that appellant looked like a "thug" and that it was "fine" for a venireperson to think so as well. In his fourth issue, appellant contends that the trial court erred by denying his motion to strike Venireperson No. 25, the venireperson to whom the trial court made the complained-of statement.

#### A. Propriety of Trial Court's Statement

[17]The trial court may not, "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury [its] opinion of the case." TEX. CODE CRIM. PROC. ANN. art. 38.05 (Vernon

1979); *Devis v. State,* 18 S.W.3d 777, 782 (Tex.App.–San Antonio 2000, no pet.) ("To the jury, the language and conduct of the trial court have a special and peculiar weight."). Ordinarily, an appellant's complaint regarding an improper judicial comment must be preserved at trial. *Unkart v. State,* 400 S.W.3d 94, 99 (Tex.Crim.App.2013). To the extent appellant relies upon the Court of Criminal Appeals' decision in *Blue v. State* for the proposition that the trial court's comments constituted fundamental error and required no objection, we note that, in *Unkart,* the Court of Criminal Appeals explicitly stated that *Blue* was a plurality decision and "has no precedential value," although courts may consider the opinions in *Blue* "for any persuasive value they might have." *Id.* at 101.

In *Blue,* the trial court made the following statement to the entire venire panel during voir dire:

[This case], which we are going on, is a situation where the attorney has been speaking to his client about what does he want to do. And when you are on the button like these cases, it's a question. Frankly, an offer has been made by the State or do I go to trial. And he has been back and forth so I finally told him I had enough of that, we are going to trial. You have been sitting out here and this is holding up my docket and I can't get anything done until we know if we are going to trial or not.

**\*11** Frankly, obviously, I prefer the defendant to plead because it gives us more time to get things done and I'm sure not going to come out here and sit. Sorry, the case went away and we were all trying to work toward that and save you time and cost of time, which you have been sitting here and I apologize about that. I told the defendant that. Like I said, I have enough of this and [I am] going to trial.

41 S.W.3d 129, 130 (Tex.Crim.App.2000). The defendant did not object to the trial court's statements. *Id.* On appeal, a plurality of the Court of Criminal Appeals held that the trial court's comments "imparted information to the venire that tainted the presumption of innocence" and could not "be viewed as fair and impartial." *Id.* at 132. The plurality therefore concluded that the comments "were fundamental error of constitutional dimension and required no objection." *Id.*

Here, during voir dire, defense counsel asked the members of the venire to "speak up" if any of them were thinking, " 'I'm already kind of leaning towards [appellant] being guilty.' " Venireperson No. 25 raised his hand, and he had the following exchange with defense counsel:

[Defense counsel]: Juror No. 25, you think you couldn't give him a 100 percent fair trial?

Venireperson: Probably not.

[Defense counsel]: Would you not hold the State to their burden of proof?

Venireperson: No, I would hold the State to their burden, but I don't think I could give him a fair trial.

After defense counsel completed his portion of voir dire, the trial court dismissed the venire to take a short break and brought Venireperson No. 25 up to the bench. The trial court then asked the following questions:

The Court: You said based on [appellant's] looks you could not give him a fair trial?

Venireperson: Yes, sir.

The Court: But you also said that you could follow the law and you said you would hold the State to its burden of proof beyond a reasonable doubt?

Venireperson: Yes. Just based on his looks alone, he looks like a thug.

The Court: That's fine. I don't disagree with that. In fact, I agree with that. The question is, can you follow the

29

law and hold the State to its burden of proof and listen to the evidence?

Venireperson: Yes, I can.

Venireperson No. 25 returned to his seat, and the trial court stated, "All right. He's in." Defense counsel did not object to the trial court's statements or to the court's questioning of Venireperson No. 25. Defense counsel used a preemptory strike against Venireperson No. 25, and he did not serve on the jury.

We agree with the State that the trial court's complained-of statements here, unlike the statements made in *Blue,* did not "vitiate[ ] the presumption of innocence" and did not constitute fundamental error. *See* 41 S.W.3d at 132. In *Blue,* the trial court made the challenged statements to the venire as a whole at the beginning of voir dire. *Id.* at 130. Thus, every venireperson who ultimately served on the jury heard the trial court's comments. Here, the trial court recessed the venire and called Venireperson No. 25 up to the bench for further discussion. The record provides no indication that any other venireperson, let alone a venireperson who served on appellant's jury, heard the trial court's comments. Furthermore, although the trial court stated that it was "fine" for Venireperson No. 25 to believe that appellant looked like a thug and agreed with the venireperson's comment, the court also emphasized that, regardless of appellant's physical appearance, the key issue was whether the venireperson could listen to the evidence in the case and hold the State to its burden of proof. *See Unkart,* 400 S.W.3d at 102 (distinguishing *Blue* and noting that, while trial judge stated that if he were on trial he would want to testify, judge also emphasized that law requires jurors not to hold defendant's failure to testify against him and that jurors must be able to follow that law). Vernireperson No. 25 indicated that he could do so.

**\*12 [18]**Because the trial court's complained-of statements did not constitute fundamental error, appellant was required to object to the statements to preserve error for appellate review. *See id.* at 99 ("Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial."). Here, appellant did not object to the trial court's statements and thus failed to preserve this complaint for appellate review.

We overrule appellant's third issue.

### B. Denial of Motion to Strike Prospective Juror

[19] [20] [21] [22]A venireperson is challengeable for cause if he "has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely." *Gardner v. State,* 306 S.W.3d 274, 295 (Tex.Crim.App.2009); *see* TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9), (c)(2) (Vernon 2006). To be challengeable, the bias or prejudice must "substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law." *Gardner,* 306 S.W.3d at 295. Before a venireperson may be excused on the basis of bias or prejudice, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Id.* The proponent of a challenge for cause has the burden of establishing that the challenge is proper by showing that "the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow the law." *Id.*

[23]We review a trial court's ruling on a challenge for cause "with considerable deference because the trial judge is in the best position to evaluate a veniremember's demeanor and responses." *Id.* at 295–96 (citing *Colburn v. State,* 966 S.W.2d 511, 517 (Tex.Crim.App.1998)). Thus, a trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Id.* at 296. "When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, we give particular deference to the trial court's decision." *Id.*; *Robinson v. State,* 989 S.W.2d

456, 458 (Tex.App.–Houston [1st Dist.] 1999, pet. ref'd) ("If a venire member equivocates on her ability to follow the law, the reviewing court must defer to the trial court's judgment.").

Appellant argues that Venireperson No. 25 "clearly expressed bias and prejudice and unequivocally stated he could not be fair." Venireperson No. 25 did not, however, unequivocally state that he could not follow the law. When asked by defense counsel whether he could give appellant "a 100 percent fair trial," Venireperson No. 25 responded, "Probably not." He then stated, in response to a question concerning whether he would hold the State to its burden, "No, I would hold the State to their burden, but I don't think I could give him a fair trial." At the bench conference, Venireperson No. 25 agreed with the trial court that he "said based on [appellant's] looks [he] could not give [appellant] a fair trial" and "also said that [he] could follow the law and [he] said [he] would hold the State to its burden of proof of beyond a reasonable doubt." Venireperson No. 25 then clarified, "Just based on his looks alone, [appellant] looks like a thug." The trial court asked, "[C]an you follow the law and hold the State to its burden of proof and listen to the evidence?" Venireperson No. 25 replied, "Yes, I can."

At most, therefore, Venireperson No. 25 vacillated before stating that he could follow the law and hold the State to its burden of proof. *See Robinson,* 989 S.W.2d at 461 ("[A] trial judge may properly overrule a challenge for cause even if a venire member is not unequivocal as to the ability to follow the law despite personal prejudices."). Venireperson No. 25 indicated that he "probably" could not give appellant a fair trial and that he did not "think" he could give appellant a fair trial. He also, however, stated that he would listen to the evidence, hold the State to its burden, and follow the law, despite believing that appellant "look[ed] like a thug." We defer to the trial court's ruling denying appellant's challenge for cause to Venireperson No. 25. *See Gardner,* 306 S.W.3d at 296 ("When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, we give particular deference to the trial court's decision."); *Robinson,* 989 S.W.2d at 461 ("Even if [the veniremember] vacillated about his ability to set aside his personal feelings on a defendant's decision to testify, we must defer to the ruling of the trial court."). We therefore hold that the trial court did not abuse its discretion in denying appellant's challenge for cause.

**\*13** [24]To the extent appellant argues that the trial court improperly questioned Venireperson No. 25 and attempted to rehabilitate him, appellant must object on this basis before the trial court to preserve error, and here he failed to do so. *See Woodall v. State,* 350 S.W.3d 691, 695 (Tex.App.–Amarillo 2011, no pet.) ("No objection was made by Appellant's counsel that the trial court erred in any way by personally questioning prospective jurors. By failing to present this objection at trial, Appellant failed to preserve the issue for review."); *see also* TEX. R. APP. P. 33.1(a)(1) (stating that, to preserve error, complaining party must make timely request, objection, or motion to trial court that states grounds for complaint with specificity).

[25] [26]Moreover, even if appellant had preserved this issue for appellate review, trial courts have "inherent authority to question prospective jurors regarding their qualifications and ability to serve as fair and impartial jurors." *Woodall,* 350 S.W.3d at 695; *see also Gardner v. State,* 733 S.W.2d 195, 210 (Tex.Crim.App.1987) (holding, in capital case, that trial court is not statutorily prohibited from individually questioning prospective jurors on issues "beyond initial questioning regarding points of law"). Trial courts may intervene in voir dire examinations "for purposes of clarification and expedition," and trial court comments during voir dire do not constitute reversible error unless the comments "are reasonably calculated to benefit the State or prejudice the defendant's rights...." *Gardner,* 733 S.W.2d at 210.

[27]Here, Venireperson No. 25 at times stated that he did not believe he could give appellant a fair trial but also stated that he could hold the State to its burden of proof. In light of this equivocation, we conclude that the trial court did not err in intervening and asking Venireperson No. 25 a series of questions to clarify whether, despite his personal belief that appellant "look[ed] like a thug," he could properly listen to the evidence, hold the State to its burden, and follow the law. These questions were not "reasonably calculated to benefit the State or prejudice the defendant's rights." *See*

*id.*

We overrule appellant's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

**All Citations**

--- S.W.3d ----, 2015 WL 4101164

Footnotes

1       *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011).

2       The State argues that, on appeal, appellant "does not complain of the matter he raised in his trial objection (i.e., failing to provide Johnson's cross-examination and redirect testimony about the number of people present)." We note, however, that appellant argues in his appellate brief that "even though the jury did not specify in writing that it desired more than the State's questioning of a single witness, it was error for the trial court to so limit its interpretation of the jury's dispute" and that article 36.28 "does not require that such a request be limited to either a single witness or a single lawyer's questioning." This argument thus encompasses appellant's trial-level objection that the trial court erred by limiting the testimony read back to the jury to Johnson's testimony on direct, and, therefore, this complaint is preserved for appellate review. *See Yazdchi v. State,* 428 S.W.3d 831, 844 (Tex.Crim.App.2014) (holding that, to preserve error, complaint on appeal must comport with objection made at trial).

3       Mickie Ebermann did not testify at appellant's trial.

4       We note that, in an unpublished decision, the Fourteenth Court of Appeals has held that "[i]mpermissibly suggestive procedures that confirm a witness's choice are disfavored for their tendency to reduce trustworthiness of subsequent identifications." *See Garcia v. State,* No. 14–06–00570–CR, 2007 WL 2447301, at *2 (Tex.App.–Houston [14th Dist.] Aug. 30, 2007, pet. ref'd) (mem. op., not designated for publication) (holding such when witness viewed photo-array eighteen days after crime and then viewed exact same photo-array over two years later); *see also Burkett v. State,* 127 S.W.3d 83, 88 (Tex.App.–Houston [1st Dist.] 2003, no pet.) ("We recognize that, in some situations, a police officer's comment that a witness has 'a good memory' following an identification may render that identification impermissibly suggestive.").

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.